# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ATLAS RESOURCES, INC., a New Mexico
corporation,

       Plaintiff,

vs.                                                                                       No. 09-CV-01113 WJ/WDS

LIBERTY MUTUAL INSURANCE CO.,
a Massachusetts corporation,
       Defendant,

-and-

FIRST COMMUNITY BANK, a New Mexico
bank,

       Interested Party.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER and DENYING REQUEST FOR PRELIMINARY INJUNCTION

THIS MATTER comes before the Court upon Defendant's Motion to Dissolve Temporary Restraining Order, filed November 23, 2009 **(Doc. 2),** following an evidentiary hearing. Having considered the parties' briefs and the applicable law, I find that Defendant's motion is well-taken and shall be granted.

## BACKGROUND

**I.**    **Factual Background**

Atlas Resources, Inc. ("Atlas") is an employee leasing company. In an "Agreement for Guarantee of Financial Obligations" ("Agreement") entered into between Atlas and Defendant

Liberty Mutual Insurance Company ("Liberty Mutual"), Atlas contractually agreed and was required to provide security for the sale of a workers' compensation plan and its associated premiums in the form of an irrevocable Letter of Credit. Deft's Ex. 2. In July 2008, Atlas's financial institution, First Community Bank (the "Bank") issued an irrevocable standby Letter of Credit ("LOC") for Liberty Mutual's benefit, in the amount of $5,200,000.00, payable to Liberty Mutual on presentment of a sight draft. Deft's Ex. 3. According to the terms of the LOC, the Bank's obligation to honor presentment was not subject to any condition or qualification, entitling Liberty Mutual to immediately draw on the full amount of the LOC in the event of Atlas's default or nonperformance. Further, under the terms of the Agreement between the parties, Liberty Mutual could, at its "sole discretion," require an amended or additional Letter of Credit if Liberty Mutual determined that the estimated amount of unpaid obligation owed by Atlas is greater than the amount of the existing LOC. Deft's Ex. 2, ¶ 7. The Agreement also allowed Liberty Mutual to draw upon the LOC if Atlas failed to pay or reimburse Liberty Mutual "in a timely fashion" (Ex. 2, ¶ 9).

In May 2009, Liberty Mutual required an increase in the amount of cash collateralizing the LOC through an escalating schedule in intervals of $791,634, with the increases due on the fourth day of every other month, continuing until May 4, 2010. Deft's Exs. 8 & 9. Atlas agreed to the revised schedule. Liberty Mutual also required that, beginning in June, 2009, Atlas was to provide a backup LOC from another financial institution.

In October, 2009, Atlas communicated to Liberty Mutual that it would be looking for another financial institution to provide the backup LOC, and that if efforts to obtain the backup LOC were unsuccessful, Atlas would be canceling the policies currently in effect. In general, these communications were made by Atlas's President, Jimmy Daskalos, to Jeffrey Tipton,

Liberty Mutual's Senior Vice President and Chief Underwriting Officer. Tipton Decl. (attached to motion, preceding Exhibit 1). At the end of October, 2009, Atlas notified Liberty Mutual that it would be canceling its policy on December 1, 2009 and requested a revised security requirement for the LOC securing policy coverage up until that date. Ex. 11.  Mr. Tipton advised Atlas on November 2nd that Liberty Mutual was working to determine the revised collateral amount for the LOC, and that the final collateral amount was not finalized because the actuary had been out of the office.

Atlas's scheduled LOC increase was due on November 4, 2009.  It is undisputed that Atlas failed to pay the $791,634.00 which was then due.  *See* Ex. 13.  Atlas's position is that it was not obligated to pay the November increase, based on Liberty Mutual's representation that it would provide Atlas with a revised collateral amount.  Atlas charges Liberty Mutual with delaying negotiations until the full balance of the LOC was due.  Liberty Mutual contends that Atlas was still bound by its contractual agreement to honor the terms of the LOC when the November amount became due, and that Atlas's non-performance entitled Liberty Mutual to draw on the LOC held by the Bank.  It is clear that both parties understood that the policy was canceled as of December 1, 2009.  What is not so clear (and which seems to be at the center of the underlying dispute) is whether the policy had been canceled prior to that time.

In November, 2009, Atlas filed suit in the Second Judicial District Court, County of Bernalillo, State of New Mexico (the "state court"), asserting claims of misrepresentation, unfair trade practices, unjust enrichment and equitable estoppel, based on what Atlas contends was a prior understanding between the parties that their contract would end before the full amount was due under the LOC.

**II.    Procedural Background**

When Atlas failed to pay Liberty Mutual the increased amount of collateral due on the LOC in November of 2008, Liberty Mutual prepared to draw on the LOC held by the Bank.  At that point, Atlas sought and obtained an *ex parte* Temporary Restraining Order ("TRO") from the state court to prevent Liberty Mutual from drawing on the standby LOC.  Atlas argued, *inter alia*, that if Liberty Mutual draws down the LOC, which is allegedly worth $7.5 million, Atlas would be unable to fund an alternate workers' compensation plan.  Before the TRO expired, it was extended for another 10 days until November 29, 2009 and a preliminary injunction hearing was set for November 25, 2009.  Before the state court hearing could take place, Liberty Mutual removed the case to this court on November 23, 2009.  The state court order enjoined Liberty Mutual from drawing down the LOC, and also enjoined the Bank from paying on the draft.  Doc. 1-2 at 41-42.

On November 24, 2009, this Court held a telephonic scheduling conference at which the Court extended the TRO under Fed.R.Civ.P. 65(b)(2) and set a merits hearing on November 30, 2009. Doc. 5.  On November 25, 2009, Atlas filed a Motion to Remand (Doc. 7).  There is no dispute that there is diversity between Atlas and Liberty Mutual and that the amount in controversy exceeds $75,000.00.  The Bank does not consent to removal and so diversity jurisdiction depends on whether the Bank is a nominal party or a real party in interest.  *See Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 369 (7th Cir.1993) (if party to a suit is merely a nominal party, its presence in the suit will not defeat removal; a nominal party need not join in the removal petition). For the reasons stated on the record at the November 30, 2009 hearing, the Court found that the Bank was a nominal party and thus removal was proper based on diversity of citizenship.  *See* Doc. 11.

The Court then heard testimony at the evidentiary hearing and oral argument on whether

the TRO should become a preliminary injunction or whether the TRO should be dissolved.  The Court reserved ruling to allow the parties to supplement their briefs, which they have both done, and which the Court has considered. *See* Docs. 13 & 14.  The Court also extended the TRO for another ten days, as provided under Rule 65(b).

Liberty Mutual seeks a dissolution of the TRO, contending both that it was not justified on the merits, and also that it was procedurally flawed.  The procedural argument is that the second TRO exceeded the ten-day limit as required by Rule 1-066(B)(2) of the New Mexico Rules of Civil Procedure, and was impermissibly extended beyond the date of the preliminary injunction hearing. The Court's resolution of this matter is based on whether there is any merit to a continuation of injunctive relief in the form of a preliminary injunction.  Because the Court finds that there is insufficient evidence to support such relief, I need not pass on the procedural challenges.  Atlas's responses to Liberty Mutual's challenges to the injunction are largely contained in the state court pleadings, in which Atlas contends that it will suffer irreparable harm without an injunction in place.  Doc. 1-2, at 31-38.

### III.    Legal Standard

Courts use a well-established four-part test to decide whether to grant injunctive relief. To obtain a TRO, the moving party must establish four requirements: (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if the relief is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the TRO; and (4) the TRO, if issued, is not adverse to the public interest. See *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir.2001); *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 854 (10th Cir.1995) (citation omitted).  If the plaintiff fails to meet its burden on even one of the requirements for a TRO, the court should deny the request for emergency injunctive relief.

Under some circumstances, the Tenth Circuit has recognized a relaxed "modified likelihood of success" requirement. A plaintiff may establish a likelihood of success in a modified manner where it has made a showing that the latter three factors "tip strongly" in its favor. *See Valley Community. Preservation Comm'n v. Mineta*, 373 F.3d 1078, 1083-84 (10th Cir.2004)(quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d at 1256)(internal quotations omitted). "If the movant has satisfied the first three requirements for a preliminary injunction, the movant may establish likelihood of success by showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation." *Walmer v. U.S. Dep't of Def.*, 52 F.3d at 854 (citation omitted). The modified showing of likelihood of success will be met "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coalition v. Flowers*, 321 F .3d at 1256 (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir.2002)).

**DISCUSSION**

The TRO which was extended by the Court under Fed.R.Civ.P. 65 is currently in place. Thus, if the Court grants Liberty Mutual's motion, then the TRO now in place by this Court would be dissolved, and Liberty Mutual would not be prevented from drawing down on the LOC held by the Bank.  In order to keep the injunction in place, Atlas has the burden of showing that a preliminary injunction is warranted pending a trial on the merits.  *See Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1194 (10th Cir.1999) (party requesting a permanent injunction bears the burden of meeting four factors).

**I.     Likelihood of Success on Merits**

Liberty Mutual contends that under the parties' Agreement, it was justified in preparing to draw down on the LOC when Atlas failed to make the November payment increase. Atlas asserts in the complaint that it relied on an understanding between the parties that Atlas would be cancelling its policy, and that Liberty Mutual delayed in sending a revised payment schedule to Atlas until the last collateral increase was due.

Atlas makes much of the fact that Liberty Mutual never gave a reason for the collateral increase from $7.5 million to $9 million, contending that in the past, the parties had negotiated the terms of the collateral. However, the plain terms of the Agreement do not require Liberty Mutual to give Atlas a reason for amending the terms of the LOC when it determines that such a modification is necessary to bring the amount of unpaid obligations in line with the LOC.

Mr. Tipton testified at the hearing, and gave reasons why Liberty Mutual expected an increase in the need for claim coverage for Atlas. It appears to be undisputed that Atlas is current on payments for claims which are due.[1] However, Liberty Mutual would still be required to secure payment for claims which have not been filed or processed, but for which it is still responsible as of December 1, 2009, the date the policy was officially cancelled. Thus, even though Atlas was current as to payments on processed claims, Liberty Mutual considered itself "undersecured" by Atlas.

The basis for Atlas's claims against Liberty Mutual is that it made false representations to Atlas concerning a revised collateral amount. Atlas relied on those representations in making its decision not to increase the amount, and was not provided the revised terms until after the November collateral increment was due. Thus, in order to show a likelihood of success on the

---

[1] Mr. Tipton also explained that Atlas was responsible for the first $500,000.00 of claims coverage, with Liberty Mutual picking up the excess coverage.

merits, Atlas needs to show some wrongdoing on the part of Defendant concomitant with its delay in getting the revised schedule to Atlas, and in making representations that were false or misleading.

While the Court makes no findings on the merits of Atlas's claims, I am required to determine the likelihood of Atlas's success on those claims. Based on the available evidence and testimony, I am not convinced that success on the merits is sufficiently probable to meet the first factor required to obtain injunctive relief. It is true that communications between the parties could be read to support Atlas's position – but those communications support Liberty Mutual's position as well.

On October 30, 2009, an e-mail was sent to Liberty Mutual by Atlas that it would be "ready to move" on December 1, 2009. Liberty Mutual requested a clear confirmation that Atlas indeed wanted to cancel the policies as of December 1. On November 2nd, Liberty Mutual apologized for the delay in getting Atlas the revised collateral amount, explaining that the actuary had been out of the office a few days, and that the final amount would be determined the following day. Ex. 12. Atlas did not pay the collateral increase due on November 4th, 2009. Ex. 1.

Liberty Mutual contends that it was not entirely clear that Atlas intended to cancel the policy. Correspondence between the parties suggest there was some question on this issue, and an exhibit admitted at the hearing certainly lends credence to Liberty Mutual's position. In an e-mail dated November 3, 2009, from Atlas to Mr. Tipton, Mr. Daskalos stated that:

> It's not what we want to do, it is Liberty that is canceling us, let us make that clear. We are not canceling, we are being forced out by Liberty. . . don't try to send me an email that it is us that is canceling after I have been threaten [sic] and harassed for the last 5 months. . . if Liberty wishes to cancel us, if that's what they are choosing to do, just let me know the date.

Court's Ex. 1.  This e-mail supports the testimony of Mr. Tipton, who stated that as of November 5, 2009, Liberty Mutual was uncertain whether Atlas was cancelling the policy, but that by November 15th, the parties had come to an agreement that there was a mutual cancellation of the policy as of December 1, 2009.

The essence of Atlas's lawsuit is that Liberty Mutual should not have treated Atlas's failure to make the November collateral payment as a default, based on Atlas's notice to Liberty Mutual that it intended to cancel the policy after being told by Liberty Mutual that it would provide Atlas with a revised collateral amount.  However, there is a real question as to whether there was a meeting of the minds concerning whether Atlas intended to cancel the policy or whether those stated intentions were still rhetoric in early November, when the collateral increase was due.  The resolution of this question is critical to whether there was any wrongdoing on the part of Liberty Mutual.  Thus, The Court cannot find that there is a reasonable probability that Atlas will ultimately be entitled to the relief which it seeks.

Even if one assumes that Atlas can make a showing under the modified standard for injunctive relief – that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation – Atlas is unable to show that the other three factors "tip strongly" in its favor.

## II.     Irreparable Injury to Plaintiff

Atlas argues that it would be irreparably injured by Liberty Mutual's ability to draw down the LOC: first, Atlas's cash assets would be depleted and it would be unable to secure another LOC at a different financial institution; second, Atlas' corporate image would suffer a loss of goodwill.  Liberty Mutual contends that there is no authority for the proposition that a court may enjoin a beneficiary from drawing on an irrevocable, standby letter of credit absent an

allegation of fraud.

A.      "Rule of Independence"

Liberty Mutual's argument relies on the "Rule of Independence," which is a key component in transactions involving letters of credit, and which the Court finds is dispositive here. The "Rule of Independence" requires an issuer of a letter of credit to honor a draft or demand for payment which complies with the terms of the relevant letter of credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary. *See* Uniform Commercial Code (U.C.C.) (codified at NMSA 1978, § 55-1-108).[2]

The Tenth Circuit recognizes the Rule of Independence as "the cornerstone of letter of credit law" which means that the issuer's obligation to pay on a letter of credit is "completely independent from the underlying commercial transaction between the beneficiary and the account party":

> The bank's obligation to the beneficiary is independent of the beneficiary's performance on the underlying contract. Put another way, the issuer must pay on a proper demand from the beneficiary even though the beneficiary may have breached the underlying contract with the customer. . . .The independence of the letter of credit from the underlying commercial transaction facilitates payment under the credit upon a mere facial examination of documents; it thus makes the letter of credit a unique commercial device which assures prompt payment.

---

   [2] The Uniform Commercial Code, sec. 5-114(2)(b), adopted in New Mexico as the Uniform Commercial Code (UCC), NMSA 1978, § 55-5-109, codifies the fraud exception to the Rule of Independence. NMSA 1978 Section 55-5-109 provides that, where documents comply on their face with terms found in the letter of credit, a court can enjoin payment *only* where it finds material fraud by the beneficiary on the issuer or applicant. This fraud exception, however, is a narrow one. A court may enjoin payment only where material fraud is shown, and not where the party alleges improper performance.

*In re Slamans* 69 F.3d 468, 474-75 (10th Cir. 1995) (citations omitted);[3] *see also Voest- Alpine v. Chase Manhattan Bank,* 707 F.2d 680, 682 (2d Cir. 1983) (bank's payment obligation to the beneficiary is "primary, direct and completely independent of any claims which may arise in the underlying ... transaction").

As a result, the separate nature of the bank's obligation to honor a letter of credit from any underlying issues (i.e., "Rule of Independence") "narrowly circumscribes the circumstances under which a court can enjoin the issuer from making payment." *See Foxboro v. Arabian American Oil Co.,* 805 F.2d at 34, 37 (1st Cir. 1986) (stating "an injunction to impede the honoring of a letter of credit is an extraordinary remedy that should rarely be granted").

The Court's review of the case law entirely supports Liberty Mutual's position that the only exception to the "Rule of Independence" is fraud. In *Langley v. Prudential Morg. Capital Co., LLC.,*554 F.3d 647 (6th Cir. 2009), the Sixth Circuit reversed the district court's grant of an injunction, based on that court's finding that plaintiff could ultimately recover on the merits. On appeal, the Sixth Circuit reversed the injunction, in part because the record did not indicate that the insurer's conduct rose to level of fraud:

> [C]ourts may not normally issue an injunction because of an important exception to the general no injunction rule. The exception ... concerns fraud so serious as to make it obviously pointless and unjust to permit the beneficiary to obtain the money. Where the circumstances plainly show that the underlying contract forbids the beneficiary to call a letter of credit; where they show that the contract deprives the beneficiary of even a colorable right to do so; where the contract and circumstances reveal that the beneficiary's demand for payment has absolutely no basis in fact; where the beneficiary's conduct has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served; then a court may enjoin payment.

---

[3] The Tenth Circuit refers to the "Rule of Independence" as the "independence principle." 69 F.3d at 474.

*Langley* at 648-49.[4]

Atlas has presented no case law or authority that stands for the propposition that a court can enjoin a bank from honoring a draft on a letter of credit where fraud was not alleged, or which suggests that claims of misrepresentation or unfair trade practices may be considered as exceptions to the "Rule of Independence."[5] Nor can the allegations in the complaint be fairly read to assert fraudulent conduct on the part of Liberty Mutual.

B.  Other Assertions of Irreparable Harm

Atlas nevertheless asserts irreparable harm by claiming that (1) a draw on the LOC will tie up cash and therefore make it difficult to obtain another LOC; and (2) loss of client goodwill and reputation. Both of these alleged "harms," however, can be addressed and resolved by money damages if Atlas prevails on the merits. Stated another way, Atlas has an adequate remedy at law.

---

[4] *See also Itek v. First Nat'l Bank of Boston,* 730 F.2d 19, 24 (1st Cir. 1984) (finding that a court can enjoin payment of letter of credit only if there is "fraud in the transaction"); *In re Irrevocable Standby Letter of Credit No. SE444383W*, 336 F.Supp.2d 578 (M.D.N.C.,2004) (denying injunction where there was no clear indication that plaintiff would succeed on its claims that it had substantially performed and that any draw by defendant on the LOC would unwarranted, or even fraudulent).

Further, mere allegations of fraud are not necessarily enough to support an injunction enjoining a bank from honoring a letter of credit. *See*, *e.g.,Warner v. Central Trust Co., N*.A. 715 F.2d 1121,1124 (6th Cir. 1983) (noting district court properly denied plaintiff's action to enjoin the honoring of a letter, despite plaintiff's allegations of fraud, since plaintiff had not shown a substantial likelihood of proving fraud in the transaction which produced the letter of credit).

[5] At the hearing, Plaintiff cited to a California state court case, *Western Security Bank v. Superior Court*, 45 Cal.Rptr.2d 664 (Cal.App. 2 Dist. 1995), which did involve fraud in the underlying claims, specifically, "fraud in the transaction." 45 Cal.Rptr.2d at 680. Further, further review was granted in this case, and the opinion was superseded by *Western Sec. Bank, N.A. v. Superior Court* (Beverly Hills Business Bank), 909 P.2d 327 (Cal. Jan 18, 1996) (NO. S037504). All in all, this is not a case which helps Plaintiff..

Mr. Daskalos testified at the hearing that if Atlas sought another letter of credit, it may be required to provide only cash security for future letters of credit, instead of cash and assets which now provide the collateral for the LOC with the Bank. He also stated that ownership of real property would be "tied up" if Liberty Mutual was allowed to draw on the LOC. However, a bank's decision to extend credit is based on multiple factors.[6] Given the decline in value of real estate in the current economy, a different bank may reasonably determine that it would require cash only as collateral because of a depressed real estate market, and not necessarily because the potential borrower had a letter of credit which was drawn down. At the November 30th hearing, Mr. Daskalos testified that Atlas could get credit from other financial institutions, although they were "limited" in number.

Mr. Daskalos also testified that very few companies will provide workers' compensation to employee leasing companies because this is a very limited market. He stated that Atlas would probably have difficulty obtaining a workers' compensation plan with another insurer with Liberty Mutual's "A" rating, although he had been in contact with another insurer with a "B+" rating.[7] However, any difficulty in finding another insurer for Atlas' workers' compensation coverage cannot be considered as "harm" associated with a draw on the LOC, because Atlas would be required to obtain workers' compensation coverage from a new insurer as a result of

---

[6] Mr. Chris Spencer, Chief Financial Officer for First Community Bank, explained what banks consider in extending credit to customers.

[7] On cross-examination, Mr. Daskalos was asked whether he had made inquiries for quotes from other insurers on workers' compensation policies. The witness did not give a direct answer, but stated that Atlas had several agents looking for new coverage and that his agents were still looking for another coverage has yet to find replacement carrier. However, in response to the Court's inquiry on how Atlas would be harmed by the draw on the LOC, Mr. Daskalos stated that he had in fact received a quote for a plan from a "B+" rated insurer.

the cancellation of the policy with Liberty Mutual.  In other words, if the LOC was never drawn down, Atlas still would have to obtain new coverage because of the cancellation of the policy with Liberty Mutual as of December 1, 2009.  A search for new coverage has nothing to do with whether the Bank honors the LOC.

Atlas also argues that its reputation and goodwill will be irreparably harmed without an injunction in place.  Mr. Daskalos explained that he believed that Atlas's clients would go elsewhere if Atlas changed coverage mid-contract, and that such coverage changes could indicate instability to clients.  Aside from the speculative nature of such harm, the fact is that Atlas changed coverage mid-contract because of the December 1, 2009 cancellation of the policy with Liberty Mutual. Thus, Atlas would be concerned over losing clients regardless of whether or not Liberty Mutual draws down the LOC.  Atlas' issues with Liberty Mutual related to collateral increases may have caused Atlas to reconsider continuing its coverage with Liberty Mutual in the first place, but these issues concern the underlying merits, and not the potential draw on the LOC.  Similarly, the loss of Government contracts, which requires A-rated insurance carriers for workers' compensation policies– again – is the result of the policy cancellation, and not a draw on the LOC.

Atlas cites to several cases to support its contention that a loss of goodwill is irreparable harm.  These cases, however, do not involve letters of credit and thus do not consider the "Rule of Independence" which trumps Atlas's other arguments.  Moreover, Atlas's argument on loss of goodwill is not convincing because there is an insufficient showing that Atlas's clients would go elsewhere or that Atlas would not be able to calculate its damages even if it could show a loss of clients.  Mere assertions of loss of goodwill do not establish irreparable harm, as these assertions must be backed up with evidence – evidence which is missing here.  *See Dominion Video*

*Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) (finding of irreparable harm does not rest solely on the breach of the agreement and the resulting loss of exclusivity rights; rather, the irreparable harm finding is based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position).

In *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.2d 12 (1st Cir. 1996), the First Circuit affirmed the district court's grant of a preliminary injunction where the plaintiff-dealer demonstrated significant likelihood of success on merits of its contract claims and its claim of irreparable injury. The defendant in that case was a distributor of lead crystal which refused to continue selling its product to the dealer after the dealer refused to sign a proposed agreement proscribing off-pricing. The court found that because Ross-Simons had already printed and distributed millions of copies of its catalog, its customers could have placed orders which the dealer could not fill, causing incalculable harm to dealer's goodwill.

No such probability of irreparable harm has been shown to exist in the instant matter. While Mr. Daskalos certainly believes that Atlas will lose clients, he also conceded that the extent of such loss was unknown because the draw on the LOC had not yet occurred. There was no testimony or evidence presented which strongly suggests that there were other competitors which would attract Atlas' clients. According to the testimony presented at the hearing, the employee-leasing market is small. Loss of business goodwill may be a basis for irreparable harm where there is difficulty in calculating damages. *Langley*, 54 F.3d 647 at 649 (citation omitted). Atlas's difficulty, however, is not in the calculation of damages, but in making a sufficient showing of a loss of goodwill.

Finally, in considering an asserted loss of reputation or goodwill, a court also considers

15

whether plaintiff could ultimately recover any money found to be wrongfully taken by defendant and thus could adequately address such loss.[8] Atlas has not pointed to any reason why it could not expect to recoup any money drawn from the LOC by Liberty Mutual, should it later be determined that Liberty Mutual should not have done so.

Accordingly, I find that Atlas has not made a sufficient showing of irreparable harm stemming from a loss of goodwill which is traceable to a draw on the LOC.

## III.    Balance of Harms and Public Interest

The remaining equities weigh against an injunction. While the Court makes no determination on the propriety of Liberty Mutual's urgency to draw on the LOC,[9] the Court finds that the TRO should be dissolved. The Court is not persuaded that Atlas would be harmed without the grant of an injunction to a greater degree than the Liberty Mutual would be harmed if a preliminary injunction were to issue. Morever, I find that a continuation of the injunction would be adverse to the public interest, and that a dissolution would serve the public interest. Specifically, there is a public interest in allowing banks to honor credit documents that have nothing to do with underlying litigation issues. As the Sixth Circuit stated in *Langley*:

---

[8] *See, e.g., Langley* at 649 (no showing of irreparable harm from loss of goodwill where Plaintiff may ultimately recover any amount paid to defendant under the letters of credit if there is success on the merits); *In re Irrevocable Standby Letter of Credit No. SE444393W*, 336 F.Supp. 578 (no showing of irreparable harm where there was no showing that loss of goodwill would result in permanent loss of customers, where any potential loss to reputation and goodwill were types of losses that damage award could adequately address, and where there was no indication that defendant would have been unable to repay money if it were later found to have been wrongfully taken).

[9] Liberty Mutual has asserted that there was some indication that the Bank was financially stable. However, the Court is left with the impression, based on the evidence and testimony presented at the hearing, that the Bank was no worse off than other financial institutions in the current economy.

>the "independence principle" is threatened if courts are willing to enjoin payment of letters of credit not just in exceptional cases involving fraud, but in ordinary contract disputes as well. . . . There are important policy reasons for upholding the validity of the documents without reference to the underlying agreements. The letter of credit's primary value to the financial world is its reliability. Without it, a borrower requesting a loan from an institution unfamiliar with him would be unable to obtain funds. In such a situation, the lender must rely on the credit instrument to ensure that payment will be made.

*Langley* at 649-50.

## CONCLUSION

Having reviewed the relevant pleadings, and considered the testimony of witnesses and arguments of counsel, the Court finds that Atlas has not met its burden of showing that injunctive relief is warranted. Atlas has not shown a likelihood of success on the merits. Even assuming Atlas could meet the "modified" standard for injunctive relief regarding success on the merits, the other three factors do not tip in Atlas's favor. In sum, Atlas has not provided any legal basis for continuing injunctive relief, and as a result, the TRO which is currently in place is hereby dissolved.

**THEREFORE,**

**IT IS ORDERED** that Liberty Mutual's Motion to Dissolve Temporary Restraining Order **(Doc. 2),** is hereby GRANTED and that Atlas's Request for Preliminary Injunction is hereby DENIED for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE