IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ATLAS RESOURCES, INC., a
New Mexico Corporation,

       Plaintiff and Counter-defendant,

v.                                 CIV 09-1113 WJ/KBM

LIBERTY MUTUAL INSURANCE CO.,
a Massachusetts Corporation; LIBERTY
MUTUAL FIRE INSURANCE COMPANY,
a Massachusetts Corporation.

       Defendants and Counter-claimants.

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

    1.    This matter comes before the Court on Plaintiff Atlas Resources, Inc.'s

Second and Third Motions for Sanctions. [Doc. 170 & 185].[2]  The presiding district

judge has referred these motions, and any subsequent motions for sanctions, for a

Report and Recommendation.  [Doc. 184 & 189].  The Court held a hearing on the

Motions for Sanctions on July 12, 2011 and has duly considered the briefs and exhibits

submitted by the parties as well as the oral arguments of counsel and the relevant

authorities.

---

[1] Within 14 days after a party is served with a copy of the Magistrate Judge's Report and Recommendation that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections in the United States District Court to the Report and Recommendation.  A party must file any objections within the 14-day period allowed if that party wants to have appellate review of the Report and Recommendation.   If no objections are filed, no appellate review will be allowed.

[2]  While the Second Motion for Sanctions was pending, Atlas filed a Motion to Allow Supplemental Memorandum of Law [Doc. 176], alleging further discovery abuses.  The Motion was granted [Doc. 182], and the Supplemental Memorandum of Law was filed [Doc. 183].  This Report and Recommendation discusses matters raised therein.

## The Applicable Law: The Federal Rules of Civil Procedure

### Rules 1 and 34

2.  Federal Rule of Civil Procedure 1 mandates that all of the rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."  The advisory committee notes to the 1993 amendments, which added the words "and administered," indicate that change "is to recognize the affirmative duty of the court to exercise the authority conferred by these rules to ensure that civil litigation is resolved not only fairly, but also without undue cost or delay.  As officers of the court, attorneys share the responsibility with the judge to whom the case is assigned."

3.  Federal Rule of Civil Procedure 34(b)(2)(E)(ii) provides that "[i]f a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonable usable form or forms."

4.  The advisory committee notes to Rule 34 provide that the producing party's "option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation."  Fed. R. Civ. P. 34(b) advisory committee's notes (2006 amendments).   The committee notes further provide that "[i]f the responding party ordinarily maintains the information it is producing in a

way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature." *Id*.

5.      Rule 34(b)(1)(C) states that the requesting party "may specify the form or forms in which electronically stored information is to be produced."  Rule 34(b)(2)(D) provides that if no form of electronically stored information (ESI) is identified, the responding party "must state the form or forms it intends to use."  This is in addition to Rule 26(f)(3)(C), which requires the parties' discovery plan to identify "any issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced . . . ."  Finally, Rule 37(a)(1) requires parties to confer in good faith prior to filing a motion to compel.

6.      As can be seen from the foregoing rules and advisory committee notes, the federal rules of civil procedure contemplate a *collaborative* process ensuring that ESI is produced in a usable form to the requesting party; the producing party is not to determine for itself and by itself what is "usable" to the requestor.

## Rule 26 (g)

7.      Rule 26(g) provides in pertinent part:

(1) *Signature Required; Effect of Signature*.  Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record . . . .   By signing, an attorney . . . certifies that to the best of the person's knowledge, information and belief formed after a reasonable inquiry:

.         .         .

(B) with respect to a discovery . . . response or objection, it is:

.         .         .

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation . . . .

3

. . .

(3) *Sanction for Improper Certification*.  If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both.   The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

**Rule 37**

8.    Rule 37 provides for sanctions against parties and attorneys for failure to make disclosures or to cooperate in discovery.  After a party has moved to compel and the court has issued an order compelling the discovery sought, Rule 37 provides in pertinent part:

(A) *For Not Obeying a Discovery Order*.  If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders.  They may include the following:

(I) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims, or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;
. . .
(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

(C) *Payment of Expenses*.   Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances may an award of expenses unjust.

4

**Factual Background**

9.      Plaintiff Atlas Resources, Inc. ("Atlas") is an employee leasing company. Atlas contracted with Defendant Liberty Mutual Insurance Company ("Liberty") whereby Liberty provided workers' compensation insurance and claims administration services to Atlas.  The workers' compensation plan sold to Atlas provided for a "retroactive premium feature" which based Atlas' actual premium amount on its incurred losses on claims arising during the policy period.   Atlas therefore entered into an Agreement for Guarantee of Financial Obligations (the "Agreement") with Liberty that required Atlas to provide security for the sale of a workers' compensation plan and its associated premiums in the form of an irrevocable Letter of Credit.  In July, 2008, First Community Bank (the "Bank") issued an irrevocable standby Letter of Credit ("LOC") for Liberty's benefit, in the amount of $5,200,000.00, payable to Liberty on presentment of a sight draft.  The Agreement allowed Liberty to draw upon the LOC if Atlas failed to pay or reimburse Liberty in a timely fashion.  *See* Memorandum Opinion and Order Granting Motion to Dissolve Temporary Restraining Order [Doc. 16] at 1-2.

10.      The Agreement also provided that Liberty could require an amended or additional LOC if it determined that Atlas' estimated unpaid obligation was greater than the amount of the existing LOC.  In October 2009, two weeks before the plan renewal date, Liberty informed Atlas that the LOC needed to be increased by $4,000,000 for a total of $9,200,000.00.  Based upon that news and alleged dissatisfaction with Liberty's administration of the workers compensation claims, on October 30, 2009, Atlas informed Liberty that it would be moving its business to a different insurance company on December 1, 2009.

5

11.   Further, because Liberty would be providing the insurance for just one more month, Atlas requested a downward revision as to the $9,200,000.00 LOC demand. Atlas contends that Jeff Tipton, a Liberty Vice President, assured Atlas that Liberty was working on a revision to lower the required collateral and would get back to Atlas shortly.  The November 4, 2009 deadline for securing the increased LOC passed without any further response from Liberty.  The next day, Mr. Tipton advised Atlas that any past discussions "did not suspend [its] obligations under the current contract. . . ." Liberty then sought to collect on the LOC.  *Id*. at 3; First Amended Complaint,  ¶¶ 13-31.

12.   In November 2009, Atlas filed this lawsuit in state court against Liberty, asserting claims of misrepresentation, unfair trade practices, unjust enrichment and equitable estoppel, based on what Atlas contends was a prior understanding between the parties that their contract would end before the full amount was due under the LOC. *Id*.  Liberty removed the case to federal court on November 23, 2009. [Doc. 1].  Atlas filed its First Amended Complaint on January 29, 2010 adding additional tort and contract claims.  [Doc. 38].  A Second Amended Complaint was filed on July 13, 2010, adding a claim for punitive damages. [Doc. 96].  Liberty's Answer set forth counterclaims for breach of contract and monies owed, malicious abuse of process, and breach of covenant of good faith and fair dealing. [Doc. 109].

**Discovery Background: Events Leading to Atlas' First Motion for Sanctions**

13.   The issues in this case involve discovery of information regarding Liberty's handling of the Atlas workers' compensation claim files, internal correspondence

concerning Atlas and the LOC, documents about Liberty's decision to increase reserve amounts, and other discovery going to issues of Liberty's handling of Atlas' account.

14.    In its First Request for Production of Documents,  Atlas submitted Request For Production No. 1 ("RFP 1"):

> With respect to each worker's compensation claim identified on Exhibit "A" attached hereto, please produce the complete claim file, and any and all additional documents in Liberty's possession, whether or not contained in the claim file, which in any way refer to or relate to the claim, the claimant, and/or Liberty's administration and/or handling of the claim, including without limitation, Liberty's investigation, audit, payment and/or setting reserves with respect to the claim.

Doc. 42 at 6.  It is hard to believe that the clear, concise RFP 1 has spawned multiple docket entries, multiple motions to compel -- followed by appeals -- and motions for sanctions, hearings, the awarding of sanctions, and -- to the detriment of the clients -- multiple billable hours.

15.    On May 4, 2010, then-Chief Magistrate Judge Richard L. Puglisi issued a Memorandum Opinion and Order ("MOO") [Doc. 63] on a motion to compel discovery, ordering Liberty to produce the requested workers' compensation claim files and other documents sought in RFP 1.  Judge Puglisi rejected Liberty's asserted objection that the claim files were not relevant, and expressly found that "these documents are at the heart of Atlas' claims.  Without the files, which contain the factual underpinnings of the claims made, Atlas would not be able to prove its case."  MOO [Doc. 63] at 2.  His order provided that "the documents requested [in RFP 1] shall be produced on or before May 24, 2010."  *Id*. at 3.

16.     On May 14, 2010, Liberty appealed Judge Puglisi's rulings to District

Judge William Johnson and requested a stay of that order.[3] [Doc. 74].  On June 24,

2010, Judge Johnson issued a MOO [Doc. 87], specifically affirming the order to

produce the claim files.  Undeterred, Liberty then filed a Motion for Clarification to

Judge Johnson [Doc. 94].  In his MOO [Doc. 127], Judge Johnson denied that motion

and another one improperly combined with it, and stated:

> The Court concludes that [Liberty's] motions are frivolous and
> that its refusal to cooperate in discovery is unreasonably
> forestalling legitimate discovery and increasing costs in this
> case.  The Court directs Atlas to submit the appropriate
> documentation regarding attorney fees it incurred in
> responding to Doc. 94 to Judge Puglisi so that Judge Puglisi
> may determine an appropriate attorney-fee award to Atlas at
> the same time that Judge Puglisi resolves Atlas's motion for
> sanctions filed on August 30, 2010 [Doc. 117].

Doc. 127 at 3-4.

17.     The first Motion for Sanctions [Doc. 117] came in response to Liberty's

flawed first attempt to comply with Judge Puglisi's Order [Doc. 63] to produce the

documents sought by RFP 1.  Atlas complained that Liberty produced the more than

14,000 documents in an electronic format known as tagged image files ("TIF") without

any indication as to the claim file with which each document was associated.  Moreover,

without the use of a specialized software program, TIF files are not searchable.  Judge

Puglisi held a hearing on the first motion for sanctions on October 26, 2010 [Doc. 149],

at which he found,

---

[3]  Atlas had also filed a Second Motion to Compel (involving other discovery)
[Doc. 59] and that Motion was granted in part and denied in part. [Doc. 64]  Liberty
appealed that ruling as well to Judge Johnson [Doc. 66].

> In May, I specifically ordered, uh, Liberty to produce documents in response to Request for Production Number 1, which sought a hundred and fifty-seven specific workers compensation claim files **and all documents related to those claims**.  According to Atlas, Liberty changed the hundred and fifty-seven claim files into fourteen thousand nine hundred and fourteen unnamed and unindexed PDFs.  Atlas claims the files are not sequential, that [they] are shuffled, and it's impossible to tell where one ends and another one begins.

Transcript of October 26, 2010 Hearing [Doc. 170-8] (Oct. Tr.) at 4:1-9 (emphasis added).

18.     Also during the October 26, 2010 hearing, the Court noted:  multiple problems with Liberty's piecemeal production of discovery, Oct. Tr. 4:10; responding to an interrogatory asking for calculations "with a thousand and ninety-four pages of documents, some of which contain calculations[,] Oct. Tr. 4:17-21; "lack of organized responses to request for production, production of eight hundred and ninety-three pages of exemplar policies already in Atlas' possession, and a five hundred page claim handling manual, produced over thirty-five times."  Oct. Tr. 5:4-8.

19.     When asked if there had been any discussion of electronic discovery in their Rule 26 conference,[4] counsel for the parties indicated they had not discussed discovery of ESI.  Oct. Tr. 7:6-7.  Counsel for Atlas did indicate that Liberty failed to advise Atlas of the magnitude of the ESI that would be subject to discovery in this case.

20.     When it became apparent that Liberty saw production of the claims files to

---

[4]  Rule 26(f)(3)(C) provides that the parties should discuss "any issues about . . . discovery of electronically stored information, including the form or forms in which it should be produced."

9

be expensive and burdensome, counsel for Atlas wrote to counsel for Liberty, the letter

in part providing:

> to alleviate any burden and expense to Liberty we propose that
> a mutually agreeable third-party vendor travel to Liberty
> locations where the claim files are being held, scan those files
> onto a disk and forward the disk to my office.  Obviously Atlas
> would bear the expense of obtaining its copies.  This would
> eliminate any expense or burden upon Liberty other than the
> burden to simply assemble the files at a location for scanning.
> It may also be appropriate to identify a protocol by which the
> various locations at which files are held are identified and
> scheduled for file production and scanning, exceeding the
> typical 30 day production deadline.  I would appreciate any
> input you would have regarding this proposal.

Doc. 42-3 at 23.   Mr. Diddle indicated to Judge Puglisi that "[t]his [January 22, 2010]

letter went without response because they stonewalled us."  Oct. Tr. 7:17-25.

21.    Liberty's counsel conceded that they did not respond to Atlas' proposal

and never discussed the production of ESI with opposing counsel.  Oct. Tr. 11:7-13.

Counsel for Liberty indicated that he felt that TIF format constituted sufficient

production, so he saw no need for discussions.   Oct. Tr. 11:23-24, 12: 1-8.  According

to Liberty's counsel, they had made numerous production in TIF format in March

through July 2010, and he had no indication until July 21, 2010 that production of the

information in TIF format "was an issue." Oct. Tr. 10:17-24.

22.    Having shown that the electronic documents produced by Liberty were

useless, Judge Puglisi found that Liberty failed to comply with the Court's May 4, 2010

order to produce the claim files.  He then ordered Liberty to produce the 157 claim files

in hard copy, in separate folders, indexed and labeled all at Liberty's expense.  Oct. Tr.

5:15-19.  Obviously frustrated, Judge Puglisi warned that "this is nothing but a business

dispute and I have ordered certain things to be produced and they are going to be produced and if they're not produced there's going to be some gargantuan sanctions." Oct. Tr. 14:6-9.

23.      In discussing his attorney fee submission,[5] counsel for Atlas noted that some of the fees were related to a Rule 30(b)(6) deposition of someone with knowledge of claims processing by Liberty's staff attorneys, to which Liberty objected, and Judge Johnson denied the motion for protective order as moot.  *See* Doc. 87 at 10.  The Court inquired as to whether the deposition had taken place and was told that Atlas had requested dates but that Liberty had not responded.  Oct. Tr. 16:3-6.  When asked why dates had not been given to Atlas for the Rule 30(b)(6) deposition, counsel for Liberty indicated that his client assured him that the matters for the deposition were "very complex" and it was taking time to locate an individual with knowledge.  Oct. Tr. 17:4-25.

24.      Judge Puglisi awarded Atlas $1,912.50 in attorney fees and ended the hearing with the following warning:

> this case is not a complex one.  This case should be . . . discovered and ready for either the next motion hearing or a trial within the next six months. . . . [W]e have had enough game [playing] here.  **No more games, 'cause if there are anymore games, uh, there are going to be some very serious consequences.**  Everybody understand?

Oct. Tr. 21:20-26 (emphasis added).  The transcript reflects that both attorneys indicated their understanding by answering, "Yes, Your Honor."

---

[5]  The fees were those that Judge Johnson asked Judge Puglisi to consider at this hearing.  *See* ¶ 16, *supra*.

## Atlas' Second and Third Motions for Sanctions

25.     In its Second and Third Motions for Sanctions, and at the July 12, 2011 hearing, Atlas points to three other instances of discovery violations, as well as relying on an overall pattern and practice of abusive litigation.  The three discrete instances are: (I) the Corlett e-mails, which were the subject of RFP 10 and 11; documents contained in Liberty's Automatic Reserve Calculator (ARC), which were covered by RFP 1; and the staff legal files, also covered by RFP 1.  Each is discussed in turn.

26.     **The Corlett e-mails**.  In Atlas' Second Motion to Compel [Doc. 59], it argues that Liberty made improper objections to certain discovery requests.  Among the Requests for Production were RFP 10 and 11, both of which requested, *inter alia*, all e-mails composed, created, or received by John Corlett, Liberty's Vice President and Regional Sales Manager.  *See* Doc. 59 at Exhibit A.  Judge Puglisi held that the blanket objections imposed by Liberty as to all the requests were improper, but that the specific responses given by Liberty to RFP 10 and 11 were not objectionable.  *See* MOO [Doc. 64] at 4.  He nevertheless found that the imposition of preliminary blanket objections constituted waiver of the objections raised within the specific responses to each request.

27.     Judge Puglisi then ordered that "if Liberty withheld any information believing it had stated a valid objection, which the Court finds were waived, it shall produce the information requested within ten (10) days of entry of this Order."  In the event there were no additional documents, the Court ordered Liberty to file a "verification under oath" so stating.  *Id*.  The Order was entered on May 5, 2010.

28.     In a letter dated April 12, 2010, counsel for Liberty advised Atlas of the

Bates number locations for 1,767 pages produced that were responsive to RFP 10 and

11.[6]  Some of these of 61 pages were provided to the Court.  *See* Doc. 170-4, Exhibit 4

to the Affidavit of Samuel Diddle, Doc. 70-2.  None appear responsive to Requests 10

and 11 which required production of all e-mails from, to or by John Corlett.  A

verification that Liberty had produced all documents responsive to Requests for

Production 7-17 was filed on July 28, 2010.  *See* Doc. 133-3.

29.     Eight months later on February 18, 2011 John Corlett was deposed by

Atlas.  During the deposition it was discovered that many of the e-mails Corlett had

turned over to Liberty's attorneys as responsive to RFP 10 and 11 had not been

produced to Atlas.  *See* Doc. 170-3, Exhibit 1 at pp. 4-5 of 19.

30.     On March 7, 2011, after Liberty's counsel conducted a search, it located

28,413 pages of documents responsive to the RFPs.  According to Atlas, "[m]any of

these documents have been previously produced by Liberty in some form, and not all of

the documents were covered by the Corlett discovery requests.  However, many of the

documents newly produced by Liberty on March 7, 2011 were covered by Liberty's

Court-ordered, under oath verification that it filed on July 29, 1010, wherein Liberty

certified that all responsive documents had been produced.  These documents fall

within the scope of Atlas' Request for Production Nos. 7-17."  *See* Doc. 170-1, Plaintiff's

Memorandum of Law in Support of its Second Motion for Sanctions, at 9.

---

[6]  Liberty identified the documents' locations as  Bates numbers LIB 001701-15: LIB
001574; LIB 001592-1601; LIB 001610-12; LIB 001106; LIB 001097-1102; LIB 001180;
LIB 001523-1526; LIB 001602-1627.  *See* Doc. 170-3, Exhibit 3 at p. 18 of 19.

13

31.     Liberty argues the non-production of the Corlett e-mails had been inadvertent.  Attached to the Response brief is the Affidavit of Pamela Bell, an attorney at Jackson Walker who was responsible for the discovery in this case.  *See* Doc. 186-2, Affidavit of Pamela Bell, ¶ 2.  With regard to the Corlett e-mails, she states:

> Immediately after returning from the [Corlett] deposition, I discovered for the first time that a small collection of documents had been provided by Liberty and loaded into Jackson Walker's Ringtail database, but had not been properly coded for production.

Doc. 186-2, Affidavit of Pamela Bell, ¶ 6.[7]

32.     At the July 12 hearing, Jackson Walker attorney Robert Soza, the lead counsel for Liberty, provided a somewhat different explanation for non-production of the Corlett e-mails.

> Completely a Jackson Walker problem.  We had gotten those population of Corlett documents and we put them onto a disk with documents that were claims files that were ready to produce.  So they were ready to go out the door when we got the call [from Atlas Attorney Diddle] that they wanted them in PDF [portable document format] and not TIFF.  And so what we did – again, our fault, instead of looking at the disk and seeing, you know, are there other documents other than claims files there, is we got the claims files and converted them to PDF.  But we failed to notice that there were documents in there [the original disk] that were not the claims files documents.

July Tr. 100:11-23.

---

[7]  "Ringtail" is the product name for software produced by FTI Technology.  At its website, www.ftitechnolgy.com, it describes Ringtail as "[a] single, scalable database that provides one central record of e-discovery projects."  This doesn't seem to be the case at Jackson Walker.

33.  **The ARC documents**.  The claim files requested in RFP 1 comprised

many documents, among them documents concerning the setting of reserves and the

handling of the claims.  This information was located on various software utilized by

Liberty:  ARC, BoComp, Watson and RISCTRAK.  Watson is a software package

developed by Liberty that allows claims handlers to search BoComp and another

internal database; and RISCTRAK is a service provided by Liberty to its clients, such as

Atlas, who paid an extra premium for this service.  ARC is located within BoComp, a

system used by claim handlers. July Tr.  86:19-25; 87:1-8;115:7-17.

34.  Shortly before a  scheduled a Rule 30(b)(6) deposition noticed for March

23, 2011 concerning the claim files, counsel for Liberty advised Atlas that the deposition

would have to be reset because *"we identified for the first time"* that information

requested in RFP 1 could be accessed through the ARC program.  Doc. 183-1, Exhibit

A to the Affidavit of Samuel A. Diddle at 4 (emphasis added).  Evidently, while in the

BoComp program, if "claims adjusters make a reserve change[,] they must access a

separate screen – known as an Automated Reserve Calculator ("ARC") screen – to

make a change in a claim reserve and to give a very brief reason for the change."  Doc.

186 at 6.  In fact, during an earlier Rule 30(b)(6) deposition taken in September 2010,

the Liberty representative had testified, in essence, that production of a claim file would

not be complete if it did not include the information regarding the reserves and

payments.  July Tr. 48:4-25.

35.  Liberty contends that the information contained in an ARC snapshot is

redundant because it can be found in other documents produced to Atlas. The ARC

"screen shots" submitted after the hearing, however, substantiate Atlas' position that

15

the ARC documents provide relevant reserve information not necessarily available from other produced documents generated by the alternative software. Specifically, the ARC information appears to provide greater detail for the reasons given for any change in the required reserves in an individual's claim file. Liberty subsequently produced the ARC documents to Atlas. Atlas argues this is another instance of Liberty's discovery abuses: last minute disruption of the deposition followed by an avalanche of documents (over 28,000 pages) that should have been located long before.

> 36. **The Staff Legal Files**. Again, RFP 1 asked for the claim files

> > *and any and all additional documents in Liberty's possession, whether or not contained in the claim file*, which in any way refer to or relate to the claim, the claimant, and/or Liberty's administration and/or handling of the claim, including without limitation, Liberty's investigation, audit, payment and/or setting reserves with respect to the claim.

RFP 1 (emphasis added). It subsequently came to light, after the Court-ordered production of the claim files in hard copy, that Liberty also had staff legal files for each of the claim files. But because Liberty kept the staff legal files separate from the claim files, and called them by another name, the files were not produced although they were clearly responsive to RFP 1.

> 37. The existence of these separate legal files only came to light during a Rule 30(b)(6) deposition taken by Atlas on March 29, 2011. It should be noted, however, that Atlas first sought the Rule 30(b)(6) deposition "on topics including the compensation, hiring, qualifications, review, performance evaluation, and promotion of Liberty's staff attorneys and nurse case managers" in May 2010. At that time, Liberty sought a protective order arguing that

16

> corporate representative depositions pertaining to Liberty's policies regarding staff attorneys and nurse case managers are not in any way related to those claim files, and will not yield information that is reasonably calculated to lead to the discovery of admissible evidence on the alleged mishandling of these claims.

Doc. 80 at 7.

38.     It was only after the existence of the staff legal files became known to Atlas because it insisted on such a Rule 30(b)(6) deposition, that Liberty chose to produce the staff legal files -- approximately one year after the Court had ordered production of documents responsive to RFP 1.

## DISCUSSION

39.     In a piece written a quarter-century ago, Professor Arthur R. Miller warned that pretrial discovery abuses and the attendant escalating costs of litigation would continue until "it is understood that the court system is a societal resource, not merely the private playpen of the litigants . . . ."  A. R. Miller, *The Adversary System: Dinosaur or Phoenix?*, 69 Minn. L. Rev. 1984-85 at 19 (downloaded on http:/heinonline.org). This case exemplifies Professor Miller's warning.

40.     The Corlett e-mails, the ARC documents and the staff legal files exemplify Liberty's and its counsel's failure to take discovery seriously.  Indeed, the Court is struck by the cavalier, often disdainful, attitude adopted by Liberty and its counsel.  It is clear that no discovery plan was in place (*i.e.*, developing a systematic approach to document retrieval; identifying and communicating with the client representatives who are responsible for key areas of inquiry; keeping track of documents produced by the client to the attorneys; and producing the documents in a reasonably usable form to

opposing counsel).  It is also clear that counsel abdicated its responsibility to exercise

oversight of the discovery process.  *See, e.g.*, *In re Seroquel Products Liability*

*Litigation*, 242 F.R.D. 650, 661 (M.D. Fla. 2007); *Bratka v. Anheuser-Busch Co., Inc.*,

164 F.R.D. 448, 461 (S.D. Ohio 1995).

    41.    Counsel for Liberty took full responsibility for failing to find the Corlett e-

mails,[8] but took no responsibility for the failure to produce the ARC documents or the

staff legal files.  Competent inquiry would have indicated that production was not

complete and not in accordance with the Court's order to produce *all* documents

responsive to RFP 1. What the Court finds even more egregious than the failure to

"find" the Corlett e-mails is the production of non-responsive documents to RFPs 10

and 11 and asserting that discovery was complete.  This lackadaisical approach to

discovery is not in accordance with either the letter or the spirit of the federal discovery

rules.

    42.    Over the entire two-year course of discovery in this case Liberty has made

frivolous objections, filed frivolous appeals, inundated Atlas with non-responsive

documents, and "inadvertently" failed to produce responsive documents.  As one court

stated, the offending defendant "has repeatedly relied on the sheer volume of

documents produced as an accomplishment somehow justifying its shortcomings.  In

the context of this case, the Court is not impressed by the large number of relevant

documents, especially since vast quantities were produced in a virtually unusable

---

    [8]  As indicated earlier,  Atlas argues that Liberty's verification was incorrect when it
stated that all documents responsive to RFP 7-17 had been produced.  Based on counsel's
testimony that counsel, not Liberty, had "mislaid" the Corlett e-mails, the Court finds the
verification was not inaccurate insofar as those documents are concerned.

manner." *In re Seroquel Products Liability Litigation*, 242 F.R.D. at 661 n.8.  This Court finds that quotation particularly apt to this case.

43.     Counsel for Liberty stated at the July hearing that each and every document requested by Atlas has now been produced.  However, "the fact that a party ultimately produced the requested document is not determinative of whether sanctions should be imposed."  *Cardenas v. Dorel Juvenile Group, Inc.*, 2006 W 1537934, *6 (unpublished opinion) (citing *Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1374 (10th Cir. 1978)).  In sum, parties "'cannot fail to produce highly relevant documents within their possession with impunity.  Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents.'"  *Cardenas*, 2006 WL 1537394, * 6 (quoting *Bratka*, 164 F.R.D. at 461); *see also In re Seroquel Products Liability Litigation*, 244 F.R.D. 650 (M.D. Fla. 2007).

44.     Atlas seeks sanctions for Liberty's failure to produce the Corlett e-mails, the ARC documents and the staff legal files, all of which were covered by the Court's prior discovery orders and thus would subject Liberty to Rule 37 sanctions.  The failure to produce the Corlett e-mails is pure sloppiness on the part of Liberty's counsel.  Unfortunately, it is just one more example of no one appearing to be in control of this litigant's playpen.  Sanctions are appropriate under Rule 26(g) or Rule 37, or both.

45.     As for the ARC documents, each side has produced to the Court information substantiating their respective arguments.  For example, at the hearing Liberty produced its Exhibit 1: a file for claimant Acevedo with documents compiled from Watson.  This exhibit shows that ARC, Watson, RISCTRAK, and the Journal

19

entries are all in agreement.  Atlas later submitted the file for claimant Rojo: the ARC documents, Journal Entries, and RISCTRAK.  Reserve information -- the issue Atlas is most interested in -- is not the same on the documents.  Only the ARC documents appear to have the complete reserve change information.  The parties each supplemented this information with letters to the Court with additional arguments in support of their respective positions.

46.     Having reviewed all of the information submitted by the parties, and having read their submissions and heard their arguments, the Court finds that the failure to produce the ARC documents is yet another example of dereliction of counsel's duty to exercise some control over the discovery process.  It is impossible to tell whether Liberty itself engaged in duplicitous conduct; or whether counsel just relied on Liberty to produce what was requested; or whether counsel had no system or was incapable of managing  the system it had.  Because it is counsel's duty  to exercise control over the discovery process and to ensure that its client cooperates fully in discovery, the Court finds this failure, too, falls on Liberty's counsel's shoulders and is sanctionable under either Rule 26(g) or Rule 37, or both.

47.     The Court remains incredulous at Liberty's position that RFP 1 did not encompass the staff legal files.  A party's "disingenuously hypertechnical or purposefully obtuse" interpretation of a discovery request can be sanctionable under the totality of the circumstances.  *Pepsico, Inc. v. Central Investment Corp.*, 2002 WL 32122596, *6 (S.D. Ohio 2002) (unpublished opinion).   The Court finds that both Liberty and its counsel share  responsibility for the failure to produce the staff legal files and sanctions are appropriate under Rule 26(g) and Rule 37.

20

48.     Abundant examples of gross negligence in discovery exist: the producing of a 500-hundred page document 35 times "in the exercise of extreme caution; " the purposeful conversion of HUB documents which were in a native format usable by Atlas into the useless, disorganized TIF format simply because "that's what [Liberty's attorney] would have wanted" because he had the software package required to able to search that format; the failure to conduct adequate searches for information resulting in glacially slow responses and serial production.  The conduct of Liberty' counsel in this litigation is shameful and the waste of time and resources is inexcusable.

49.     **The *Ehrenhaus* Factors.**  Having found that Rule 37 sanctions are appropriate, the Court looks to the five factors outlined by the Tenth Circuit in *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920–21 (10th Cir. 1992), to determine the appropriate sanction.

50.     **The degree of actual prejudice to the plaintiff.**  Atlas has expended substantial time and money due to Liberty's repeated failures to meet its discovery obligations as described above.  Liberty's and its counsel's failures as set forth above, indicate that Atlas was forced to spend an inordinate amount of time and money dealing with an increasingly intractable volume of discovery at great cost – time and money – to Atlas.  Plaintiff has pointed out that its business financial resources have been strained because Atlas is the David to Liberty's Goliath.

51.     **The amount of interference with the judicial process**.  The amount of time dedicated to discovery issues in this case by both the magistrate judge and the district judge far exceeds the amount of time normally expended in a two-party business

dispute.   As indicated previously, the district court has called some of Liberty's filings frivolous and an inordinate amount of time has gone into reading voluminous filings.

52.   **The culpability of the litigant.**   Early on, neither party availed themselves of the remarkably clear and forward-thinking ESI procedures set out in the above-cited Federal Rules of Procedure and accompanying commentary.  The crucial need to discuss procedures in preparation for a discovery plan lies with both parties. But especially when a party is aware that discovery will entail voluminous exchanges of ESI – in this case Liberty – it is incumbent on sharing that information with opposing counsel.  Liberty was well aware of the multiple files associated with the workers' compensation claims, yet failed to even pick up the phone in response to Atlas' proposal for ESI production.  Liberty thereby failed to its clients' costs to a minimum, and imposed a heavy burden in both time and expenses to Atlas.  *See, e.g.*, Defendants' Response in Opposition to Plaintiff's Motion for Sanctions [Doc. 126] at 1-4; Atlas' Reply Memorandum [Doc. 133] at 6-10.  In many instances the Court cannot tell whether it was Liberty or its counsel who had control of the discovery process and whose inaction and failures to act caused the discovery abuses complained of and outlined herein.  It is clear, however, that Liberty has not sought to distance itself from the decisions of its Jackson Walker attorneys.  For instance, it was Liberty that stalled on naming a Rule 30(b)(6) deponent for the staff legal files by calling the issue "very complex." *See*  ¶ 23.

53.   **Whether the court warned the party in advance that dismissal of the action would be a likely sanction for non-compliance**.  Because the offending party

in this case is the defendant, the equivalent sanction of dismissal of the action would be to strike Liberty's defenses to the complaint.  Alternatively, or in conjunction, an appropriate sanction might be dismissal of Liberty's counterclaims.  This *Ehrenhaus* factor is somewhat problematic in that the word "dismissal" has never been used by the Court in this action.  Nor has the Court in the past specifically warned that the ultimate sanctions would likely be imposed if the abusive conduct continued.  Judge Puglisi did warn Liberty and its counsel that if the discovery abuses continued, the sanctions would be "gargantuan."   The Court assumes that Judge Puglisi considered that "gargantuan" consequences would include the imposition of large monetary fines, the exclusion of evidence, and striking of defenses.  But, it is less than clear that Liberty understood that connotation given its subsequent discovery failures.

54.   **The efficacy of lesser sanctions**.  The monetary sanctions  already imposed have failed to stem the tide of abuse.  However the amounts of those monetary penalties seem relatively insignificant when compared to Liberty's assets. The Court cannot say that a big hit to Liberty's pocketbook might not cause Liberty to conform its conduct to be in accordance with the rules and future orders of this Court.

55.   Having considered the *Ehrenhaus* factors,  the Court will not recommend at this time that Judge Johnson hold a show cause hearing to see whether dismissal of the counterclaim or the striking of Liberty's defenses is warranted.   However, the case is far from over, and Liberty and its counsel are on notice that further infractions could likely result in fines or dismissal of its counterclaim, or the striking of its defenses, or the exclusion of evidence  if more discovery abuses come to light.

56.     Pursuant to Federal Rules 1 and 26, the Court, counsel, and the parties all have the obligation to oversee the discovery process to ensure that litigation costs do not spiral out of control.  Liberty and its counsel have been previously warned by both Judges Puglisi and Johnson to avoid unnecessary costs in this action.  Liberty and its counsel have not heeded these warning and failed to follow the federal rules and orders of this Court.  The Court expressly finds both Liberty and Jackson Walker to be culpable and responsible for the escalated costs to Atlas and the Court in meeting their professional obligations.

## Recommended Disposition

57.     The Court recommends that Atlas recover all of its reasonable attorney fees and costs in the preparation, filing and presentation of oral arguments as to the Second and Third Motions for Sanctions and briefing, as well as in the preparation of the Motion to File a Supplemental Memorandum and the supplemental memorandum itself, with responsibility for the amount of the recovery to be split evenly by Liberty and Jackson Walker.

58.     Atlas shall also recover from Jackson Walker any other reasonable costs and attorney fees required to obtaining production of all of the Corlett e-mails.  The fees to be awarded are those expended in depositions taken to determine whether requested documents had been produced and the fees.   Atlas shall be entitled to redepose Mr. Corlett, if necessary, at Jackson Walker's expense.

59.     Atlas shall also recover from Liberty any other reasonable attorney fees and cost required to obtain the ARC documents.  The fees to be awarded are those expended in depositions taken to determine whether requested documents had been

24

produced and the fees.   All associated costs shall also be recoverable.  Atlas shall be entitled depose a competent Rule 30(b)(6) deponent to discuss the staff legal files, if necessary, at Liberty's expense.

59.    Finally, the Court recommends that a fine equal to 30% of the recoverable attorney fees attributed to obtaining the ARC documents and staff legal files be payable to Atlas by Liberty.  This fine is assessed under Rule 26(g) in accordance with the above findings.  *See* Rule 26(g); *see also  Rottlund Co., Inc. v. Pinnacle Corp.*, 222 F.R.D. 362, 386-87 (D. Minn. 2004), *aff'd in part and rev'd in part on other grounds*, 2005 WL 407860 (D. Minn. 2005) (unpublished opinion).

60.  Counsel for Atlas shall submit its attorney fee applications and cost bills in accordance with this report and recommendation if adopted by the presiding judge, within thirty (30) days of such adoption.

Karen B. Molzen
United States Chief Magistrate Judge

25