IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**ATLAS RESOURCES, INC.**, a New Mexico
Corporation,

    Plaintiff,

v().                                            CIV 09-1113 WJ/KBM

**LIBERTY MUTUAL INSURANCE CO.**, a
Massachusetts corporation, and **LIBERTY
MUTUAL FIRE INSURANCE COMPANY**,
a Massachusetts corporation,

    Defendants.

## ORDER ON PLAINTIFF'S REQUEST FOR UNREDACTED PLAYBOOK

THIS MATTER comes before the Court on Plaintiff's Memorandum of Law in Support of Its Request for Production of an Unredacted Copy of Liberty Mutual Insurance Company's Middle Market Playbook (Doc. 265), filed November 3, 2011. I have duly considered the Plaintiff's Memorandum and Defendants' Response (Doc. 266) as well as the relevant authorities, and I will deny the request.

**I.  BACKGROUND**

Plaintiff Atlas Resources, Inc. ("Atlas"), a New Mexico corporation, brings this lawsuit against two related entities, Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company (collectively referred to as "Liberty Mutual"), both of which are Massachusetts corporations. *See* Doc. 260 at 1. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

Atlas is an employee leasing company that provided workers' compensation insurance for

its 400 employer clients through Liberty Mutual. *See Doc. 260* at ¶¶ 1-9. It filed the instant lawsuit in response to Liberty Mutual drawing on the line of credit which served as collateral for the workers' compensation premium payments and for the alleged mishandling of claims and other conduct by Defendant Liberty. *See id.* at ¶¶ 13-53.

The parties have requested the Court's assistance to resolve a number of discovery disputes in this litigation. The instant dispute concerns Liberty Mutual's 2009 reorganization and formation of a new operating structure identified as the Middle Market to which Atlas' policy was transferred. Plaintiff contends that Liberty Mutual "implemented a new corporate policy to stop writing any new workers' compensation insurance policies to professional employer organizations [PEO] such as Atlas." *Doc. 265* at 2.

Plaintiff seeks an unredacted copy of what is known as the "Middle Market Playbook," which "outlines how the Middle Market will function on a going forward basis and explains how Liberty Mutual will work with agents and brokers as it shifts away from a direct sales force." *Doc. 266* at 1-2. Defendants have produced to Plaintiff a redacted version of the Playbook for "Attorneys' Eyes Only," including all of its contents regarding underwriting and claims. Liberty Mutual has also produced the portions of the Playbook that relate to nonissuance of new PEO policies. Liberty Mutual objects to producing any more of the Playbook on grounds of lack of relevance and because the Playbook contains alleged trade secrets.

II. **LEGAL STANDARD**

The scope of discovery is generally limited to nonprivileged matters that are "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Courts may otherwise order that "a trade secret or other confidential research, development, or commercial information not be revealed or

be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G).

A party seeking to limit disclosure of trade secrets "must first establish that the information sought is a trade secret and then demonstrate that its disclosure might be harmful." *In re Cooper Tire & Rubber Co.*, 658 F.3d 1180, 1190 (10th Cir. 2009) (quoting *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir. 1981)). All thirteen counts alleged in the present case arise under state law. *See id.* at 8-13. Thus, the substantive law applicable law to this discovery dispute is New Mexico law. *See, e.g., Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1244 (10th Cir. 2006) (holding that where discovery sought was relevant to a state-law claim, the state law "governs the analysis of whether trade secrets privilege applies").

New Mexico's adoption of the Uniform Trade Secrets Act ("TSA") provides that a trade secret is

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>     (1)  derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>     (2)  is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.M.S.A. § 57-3A-2(D) (1978). The Restatement (First) of Torts notes six factors "to be considered in determining whether given information is [a] trade secret:"

> (1) the extent to which the information is known outside of [the relevant] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken [] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended [] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement (First) of Torts § 757 cmt. b (1939).  New Mexico state courts rely on these factors and the TSA definition to determine whether a trade secret exists in discovery.  *See Pincheira v. Allstate Ins. Co.*, 144 N.M. 601, 6905-606 (2008).

Once a trade secret and harm resulting from its disclosure are determined to exist, "the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action." *Centurion Indus., Inc.*, 665 F.2d at 325.  Alleged trade secrets are relevant and necessary, for instance, where they "may be the best evidence of [a defendant's] knowing failure to correct a defect" in a products liability case.  *See Cooper Tire*, 658 F.3d at 1195.  "If proof of relevancy or need is not established, discovery should be denied." *Centurion Indus.*, 665 F.2d at 325.

After each party has made its respective showing, the court will balance the need for trade secrets against any injury resulting from disclosure of the trade secrets.  *See id.*  "It is within the sound discretion of the trial court to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure." *Id.* at 326.

### III. ANALYSIS

#### A. The Middle Market Playbook Constitutes a Trade Secret.

The Court accepts the uncontroverted facts set forth in the affidavit of Liberty Mutual's Division General Manager Mark Moitoso.  Specifically, Mr. Moitoso testifies that the combination of the previously existing Liberty Mutual Business Market and Wausau Insurance Company into a single unit required new policies, procedures, and, most significantly, strategies, which are set forth in the Playbook.  *See Doc. 267-1* at ¶ 3.  Liberty Mutual's stated goal during

4

this time was to move from direct sales insurance to a business model based upon relationships between Liberty Mutual and brokers/agents.  *See Doc. 266* at 1-2.  As Mr. Moitoso states, the Playbook "articulates the strategic intent of these new policies, procedures, and strategies for the Middle Market."  *Doc. 267-1* at ¶ 4.  Because any other insurer, regardless of its size, could benefit from the information set forth in the Playbook, I find that the Playbook has independent economic value.

Moreover, Mr. Moitoso's affidavit establishes that Liberty Mutual has made reasonable efforts to maintain the secrecy of the Playbook.  For instance, each page of the Playbook is labeled as "Confidential/Proprietary Business Information and Trade Secrets of Liberty Mutual Group, Inc."  *See Doc. 267-1* at ¶ 4.  Access to the Playbook is limited even among Liberty Mutual employees, and only high ranking employees such as Underwriting Managers and Regional Distribution Managers, have access to a printable version of the Playbook.  *See id.*

Other relevant factors also counsel in favor of a finding that the Playbook constitutes confidential business information or a "trade secret."  Liberty Mutual places the Playbook's value in the millions of dollars.  *See Doc. 267-1* at ¶ 3.  The Playbook is based on work by attorneys, investment bankers, and other third-party consultants performed over the course of more than a year, at a cost of millions.  *See id.*  It includes specific financial terms relating to compensation, incentives, market divisions, and relationships between Liberty Mutual and its agents and brokers.  *See id.* at ¶ 6.  In the event the Playbook landed in the hands of other insurers, I find it would work a clearly defined and serious injury to Liberty Mutual, both in terms of potential loss of competitive advantage but also in terms of undermining Liberty Mutual's valuable relationships with agents and brokers.  Because the Playbook is, in the words of Liberty Mutual's

attorney, "a blue print of Liberty Mutual's operations strategy," the information contained within it is not easily acquired or duplicated by others absent production of the Playbook.

    **B.**    **The Playbook's Limited Relevance Cautions Against Production**

Plaintiff argues that the Playbook is relevant in that Liberty Mutual's reorganization into the Middle Market resulted in "a policy to no longer write insurance to companies like Atlas" and "dramatic changes in the manner in which Atlas' policy was underwritten and the collateral demands were made." *Doc. 265* at 6. Having reviewed the complete unredacted Playbook in comparison with the portions already produced by Liberty Mutual, I find that those portions specifically pertaining to the professional employee organizations (PEOs) like Atlas have been produced. Likewise, the Playbook's entire section pertaining to underwriting has been produced. The remaining redactions do not contain information that appears relevant to this case, let alone necessary. Therefore, I find that Plaintiff has not made the required showing of relevance and need to overcome the trade secret protection asserted by Liberty Mutual.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's request for the production of an unredacted copy of Liberty Mutual's Middle Market Playbook is **denied**.

                                               _____
                                               UNITED STATES CHIEF MAGISTRATE JUDGE