# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

ATLAS RESOURCES, INC., a New Mexico
Corporation,

        Plaintiff,

       v.                                  No. CIV 09-1113 WJ/KBM

LIBERTY MUTUAL INSURANCE CO., a
Massachusetts Corporation, and LIBERTY
MUTUAL FIRE INSURANCE COMPANY,
a Massachusetts Corporation,

        Defendants.

### MEMORANDUM OPINION AND ORDER GRANTING IN PART SANCTIONS ON PLAINTIFFS' FOURTH AND FIFTH MOTIONS FOR SANCTIONS

       THIS MATTER comes before the Court following a hearing upon the Fourth Motion for

Sanctions, filed June 4, 2012 (**Doc. 306**); and the Fifth Motion for Sanctions, filed June 27, 2012

(**Doc. 321**) filed by Plaintiff Atlas Resources, Inc. ("Plaintiff" or "Atlas") against Defendants

Liberty Mutual Insurance Co. and Liberty Mutual Fire Insurance Co. (collectively "Defendant"

or "Liberty").[1]   The Court has reviewed in depth all pleadings, materials, and arguments in

connection with previous motions for sanctions, as well as the arguments of counsel at the

hearing held in this matter.  The Court has no difficulty in making the finding that for the fourth

and fifth time in this case sanctions are clearly warranted against Liberty; however, the sanctions

that shall be imposed are not as severe as those requested by Atlas for the reason that the Court

---

[1]   Both parties presented the Court with exhibit notebooks for the hearing, but no exhibits were admitted.  Counsel
relied largely on exhibits which had previously been filed with the Court as attachments to the underlying pleadings;
and also on demonstrative exhibits outlining and organizing these exhibits.

cannot make the finding that Liberty's actions rose to the level of intent or willfulness to justify the relief requested by Atlas.[2]

## BACKGROUND

This lawsuit is essentially a business dispute between Atlas and Liberty. It was initially filed in state court on November 9, 2009 and, based on diversity jurisdiction, removed to federal court on November 23, 2009. The case has a long procedural history. Other than the hearing on Plaintiff's motion for preliminary injunction which was denied by the Court's Memorandum Opinion and Order electronically filed December 7, 2009 (Doc. 16), all the litigation in this case over the past three years has focused almost exclusively on discovery issues and discovery abuses by Defendant. While the Court is not inclined to rehash all the past including all the prior discovery disputes, some background is necessary in order to understand the context of the discovery issues in Plaintiff's fourth and fifth motions for sanctions. Moreover, in the context of prior discovery abuses by Defendant, some of the blame lies with Liberty's counsel, the Texas based firm of Jackson Walker, LLP ("Jackson Walker"), which has represented Liberty since the inception of this case. The Court wants to make clear that since Jackson Walker partner David Moran entered his appearance in this case, Attorney Moran and the current team of Jackson Walker lawyers who are representing Liberty in this case, as well as the New Mexico firm of Simons & Slattery, LLP who became local counsel for Liberty, have attempted to faithfully discharged their duties as officers of the court in accordance with the Rules of Professional Conduct and the Local Rules of this Court. Unfortunately, the same cannot be said of Jackson Walker lawyers Robert L. Soza, Jr. and Pamela M. Bell who represented Liberty before Attorney Moran and his team took over Liberty's representation.

---

[2]   The Court refers to both Liberty and Liberty's counsel as "Defendant" because Plaintiff has not made a distinction between the two for purposes of this motion.

## I.      Facts Relevant to Case on Its Merits

Atlas is an employee leasing company.  Atlas contracted with Liberty whereby Liberty provided workers' compensation insurance and claims administration services to Atlas.  The workers' compensation plan sold to Atlas provided for a "retroactive premium feature" which based Atlas's actual premium amount on its incurred losses on claims arising during the policy period.  Atlas entered into an "Agreement for Guarantee of Financial Obligations" ("Agreement") with Liberty that required Atlas to provide security for the sale of a workers' compensation plan and its associated premiums in the form of an irrevocable Letter of Credit. In July 2008, Atlas's financial institution ("Bank") issued an irrevocable standby Letter of Credit ("LOC") for Liberty's benefit, in the amount of $5,200,000.00, payable to Liberty on presentment of a sight draft.  The Agreement allowed Liberty to draw upon the LOC if Atlas failed to pay or reimburse Liberty in a timely fashion.

In May 2009, Liberty required an increase in the amount of cash collateralizing the LOC through an escalating schedule in intervals of $791,634, with the increases due on the fourth day of every other month, continuing until May 4, 2010.  Atlas agreed to the revised schedule.  *See* Doc. 2-1, Ex. 4 (Tipton Decl.).

 Beginning in June 2009, Liberty began to have concerns about the financial stability of the Bank.  In July, Atlas was informed by Jeffrey Tipton ("Tipton"), Liberty's Senior Vice President and Chief Underwriting Officer, that Atlas was to provide a backup LOC from another financial institution.  Tipton told Atlas's President, Jimmy Daskalos ("Daskalos") that if Atlas failed to secure a backup LOC, Liberty would have no choice but to convert the existing policy to a more expensive guaranteed cost plan, and bill Atlas for the difference in premiums between the two policies.  Doc. 2-1.

Atlas's Bank was unsuccessful in obtaining a backup LOC from other banks it contacted. Doc. 2-1, ¶¶ 9-11.   Daskalos told Tipton that he would continue looking for another financial institution to provide the backup LOC, but that if efforts to obtain the backup LOC were unsuccessful, Atlas and Liberty would have to mutually agree to cancel the policies currently in effect.   At the end of October, 2009, Daskalos informed Tipton by e-mail that Atlas would cancel its policy with Liberty on December 1, 2009 and requested a revised security requirement for the LOC securing policy coverage up until that date.   Mr. Tipton responded by return e-mail on November 2, 2009, that Liberty Mutual was working to determine the revised collateral amount for the LOC, but that the final collateral amount was not finalized because the employee who handled actuary matters was out of the office.

Atlas's scheduled LOC increase was due on November 4, 2009.   It is undisputed that Atlas failed to pay the $791,634.00 which was then due, and that on November 4, 2009, Liberty drew down the entire LOC Atlas had posted.   Atlas's position is that it was not obligated to pay the November increase, based on Liberty's representation that it would provide Atlas with a revised collateral amount.   Atlas claims that Liberty delayed negotiations until the full balance of the LOC was due so that Liberty could draw down on the $6 million LOC.   Liberty takes the position that Atlas was still bound by its contractual agreement to honor the terms of the LOC when the November amount became due, and that Atlas's non-performance entitled Liberty Mutual to draw on the LOC held by the Bank.

The Amended Complaint (Doc. 38) alleges state law claims against Liberty including negligent misrepresentation, unfair trade practices, unjust enrichment and equitable estoppel. Liberty asserts its own counterclaims of breach of contract and monies owed and malicious

abuse of process.  Doc. 291.   Liberty also asserts equitable affirmative defenses against

Plaintiff's claims.  Doc. 121.

## II.      Facts Relevant to Previous Discovery Motions

Defendant has been taken to task before three different judges, including the undersigned,

and has been sanctioned three times previously for various discovery abuses.   One of the

monetary sanctions was in the amount of $90,000.[3] *See* Docs. 117, 170, 239, 246, 264, 269.   At

different times during the course of discovery, the Court has found Defendant's conduct to be

sanctionable. Of particular note are the undersigned's comments in an Order granting Plaintiff's

motion for an extension of time to file an answer to Defendant's counterclaim relatively early in

the discovery process while Plaintiff's first motion for sanctions was pending before the Court

(*See* Doc. 130 at 3, n.2):

> The Court is granting Plaintiff's motion on a simple basis. However, the reason
> it was filed in the first place was not so simple, and the Court feels compelled to
> comment on the manner in which this case is being litigated by counsel for
> Plaintiff and Defendants. It is best described as a "cat-and-mouse" approach to
> litigation, at which Defendants are particularly adept.

Doc. 130 at 1.  The Court went on to note that Liberty's conduct served "no purpose other

than to protract the course of litigation" and was "contrary to the Preamble of the New

Mexico Rules of Professional Conduct. . . ."  Doc. 130 at 3.   The Court summed up its

observations of Defendant's behavior thus:

> A review of the Court's docket in this case indicates that Defendants have
> exhibited behavior in the discovery phase which has led to the Court's
> consideration of an imposition of sanctions against them. See Doc. 127 at 3
> (concluding that "Defendant's motions are frivolous and that its refusal to

---

[3]   U.S. Magistrate Judge Karen Molzen awarded Atlas attorney's fees and costs for discovery abuses (Doc. 239) and
the parties agreed to $90,000 for fees and costs.  The $90,000 sum was paid by Liberty's counsel, the law firm of
Jackson Walker.  The Court's not entirely clear whether Jackson Walker paid the $90,000 and then billed all or part
of that sum to Liberty or whether Jackson Walker paid the entire $90,000 based on the conduct of its lawyers who
were formerly representing Liberty in this case.

> cooperate in discovery is unreasonably forestalling legitimate discovery and
> increasing costs in this case. . . .").

Doc. 130 at 3.

In ruling on Plaintiff's First Motion for Sanctions, United States Magistrate Judge Richard L. Puglisi found that the discovery Liberty did produce in response to Atlas' discovery requests was useless, particularly with respect to the 157 claims files which Liberty had been compelled to produce.   At a hearing on the matter, Judge Puglisi found that Liberty's counsel had engaged in the following conduct:  (a)  multiple problems with Liberty's piecemeal production of discovery; (b) responding to an interrogatory asking for calculations "with a thousand and ninety-four pages of documents, some of which contain calculations"; and (c) "lack of organized responses to request for production, production of eight hundred and ninety-three pages of exemplar policies already in Atlas's possession, and a five-hundred page claim handling manual, produced over thirty-five times."  Doc. 170-8 at 4-5.  For example, according to Atlas, Liberty converted the material in 157 claim files into 14,914 unnamed and un-indexed PDFs. The files were not sequential, were shuffled, and it was impossible to tell where one ends and the other began.  *Id.; see also* Doc. 42-3 at 23 (Diddle Aff.).  Judge Puglisi warned the parties that "this is nothing but a business dispute and I have ordered certain things to be produced and they are going to be produced and if they're not produced there's going to be some gargantuan sanctions."  Hearing Transcr. Doc. 170-8 at 15; *see also* Doc. 117 (ruling on first motion for sanctions).

Plaintiff's second and third motions for sanctions were addressed by United States Magistrate Judge Karen B. Molzen, who found that there was a "cavalier, often disdainful, attitude adopted by Liberty and its counsel," as well as a "lackadaisical approach to discovery [which] is not in accordance with either the letter or the spirit of the federal discovery rules."

6

Doc. 239, ¶ 40.  Judge Molzen also found that counsel had abdicated its responsibility to exercise oversight of the discovery process; that Liberty had made frivolous objections over the entire two-year course of discovery; and that counsel had failed to conduct adequate searches for information, which "competent inquiry" would have uncovered.  *Id*.  She imposed on Liberty the following sanctions: (1) recovery by Atlas of attorney fees and costs for the briefing and oral arguments associated with the second and third motions for sanctions (split evenly by Liberty and Jackson Walker);[4] (2) recovery by Atlas from Jackson Walker of costs and fees required to obtain production of all Corlett e-mails and ARC documents; and (3) a fine equal to 30% of the recoverable fees attributed to obtaining ARC documents and staff legal files payable to Atlas.  Judge Molzen also put Liberty and counsel on notice that further infractions "could likely result in fines or dismissal of its defenses or exclusion of evidence if more discovery abuses come to light."  Doc. 239; *see also* Doc. 246 (Order Adopting Rep. & Rec.).

As previously noted, following the imposition of sanctions in the Court's ruling on Plaintiff's Third Motion for Sanctions, Attorney Moran became lead counsel for Liberty.  At the hearing before the undersigned on March 20, 2013, Mr. Moran told the Court that he traveled to Boston to visit Liberty's General Counsel to discuss his intentions to turn around the current discovery practices so that Liberty would be in compliance with the Court's orders and adhering to the discovery obligations required under the Federal Rules of Civil Procedure. Mr. Moran also represented to the Court that he and his colleagues at Jackson Walker took quite seriously the Court's concerns and warnings in the previous Orders on the motions for sanctions, and took issue with none of its prior rulings.

---

[4]   Judge Molzen noted that it was "impossible to tell" whether Liberty itself engaged in duplicitous conduct or whether counsel just relied on Liberty to produce what was requested.   *See* Doc. 239, ¶ 46 (". . .[I]t is counsel's duty to exercise control over the discovery process and to ensure that its client cooperates fully in discovery.").

Prior to the filing of the Fourth and Fifth Motions for Sanctions, Defendant has twice represented to the Court that responsive, non-privileged documents to Atlas' discovery requests have been produced: before Judge Puglisi at the July 28, 2010 hearing; and at the July 12, 2011 hearing before Judge Molzen (*see* Doc. 239, ¶ 43).  On July 13, 2012 (a week after Plaintiff filed the Fourth Motion for Sanctions), Mr. Moran executed a Declaration of the same.  Doc. 335-1 at 4.

## DISCUSSION

Plaintiff seeks dispositive sanctions which would effectively grant default judgment to Atlas.  Plaintiff seeks relief as follows: (1) dismissal with prejudice of Liberty's counterclaims and affirmative defenses; (2) Judgment against Liberty on liability and a return of fixed amounts that were obtained by Liberty when it drew down the LOC ($6,783,268 from the LOC plus $440,368 from a bank account); and (3) allow Plaintiff to proceed to trial on remaining compensatory damages and punitive/treble damages, allowing the jury to hear evidence on Defendant's discovery abuses committed during the litigation as evidence of bad faith.  Defendant maintains that it has made every effort to comply in good faith with the Court's Orders.

Based on the previous motions for sanctions, Defendants' conduct in the past can be described as either late, delayed or non-disclosure; or "document-dumping" where Defendant's disclosure of material was presented in such a disorganized fashion as to violate the Rules of Professional Conduct and cause undue delay in the litigation of this case.   Since Mr. Moran has taken over as lead counsel for Defendant, Plaintiff has filed its Fourth and Fifth Motions for Sanctions.  The questions before the Court now are whether Defendant (Liberty and/or defense counsel) has indeed turned over a new leaf in its discovery practices, or whether it has continued

the pattern and practice of discovery abuses which were at the core of the first three motions for

sanctions; whether such conduct warrants sanctions; and if so, the nature of the sanctions.

## II.    Legal Standards

Rule 37 permits a court to impose a number of sanctions for a party's failure to comply

with a court's discovery orders.  Rule 37(b) of the Federal Rules of Civil Procedure authorizes

the court to "issue further just orders" and to impose various sanctions upon a party for failure to

comply with  an order to provide or permit discovery, including: (1) ordering that designated

facts be taken as established; (2) precluding the disobedient party from supporting or opposing

matters at issue or  introducing designated matters in evidence; (3) striking pleadings in whole or

in part; (4) staying further proceedings until the order is obeyed; (5) dismissing the action; (6)

rendering a default judgment against the disobedient party; and (7) treating the failure to obey

the discovery order as contempt of court.   Fed. R. Civ. P. 37(b)(2)(A (i)-(vii*)*.  "Determination

of the correct sanction for a discovery violation is a fact-specific inquiry that the district court is

best qualified to make."  *Morse v. County of Los Alamos*, 2009 WL 5220170, 3 (D.N.M. 2009).

The Tenth Circuit has articulated a number of factors that may inform the district court's

discretion in determining whether dismissal is an appropriate sanction: (1) the degree of actual

prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the

culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the

action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.

*Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir. 1992).  This list is not exhaustive, nor are

the factors necessarily equiponderant.  *See Archibeque v. Atchison, Topeka, and Santa Fe*

*Railway Co.,* 70 F.3d 1172, 1174 (10th Cir. 1995); *Ehrenhaus*, 965 F.2d at 921.   In considering

Plaintiff's motions, the Court need not conduct any further analysis concerning the adequacy of

notice or warning to Defendant.  It is clear that full due process has been afforded to Liberty about what the consequences would be if Liberty continued its discovery abuses.

Plaintiff essentially seeks a default judgment against Defendant, constituting a full dismissal of any defense or counterclaim.  However, dismissal represents an extreme sanction appropriate only in cases of willful misconduct. *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992).   A willful failure is "any intentional failure as distinguished from involuntary noncompliance." S*alas v. Brigham*, No. CIV 08-1184, 2010 WL 4322622, at *4 (D.N.M. Oct. 6, 2010) (denying motion for default judgment where defendant was unaware of existence of documents).  No wrongful intent need be shown. *Toma v. City of Weatherford*, 846 F.2d 58 (10th Cir. 1988).   A court should not render a default judgment for a party's inadvertence. *Ocelot Oil Corp. v. Sparrow Indus*, 847 F.2d 1458, 1464-65 (10th Cir. 1988) ("We have reversed dismissals and defaults, or remanded for more specific findings on the parties' responsibility, where inadvertence or simple neglect were the basis of the court's decision."). "Mere negligence or confusion is not sufficient to justify a finding of delay or willful misconduct." *Bettis v. Toys "R" Us-Del., Inc.*, 273 Fed. Appx. 814, 818 (11th Cir. 2008).

While discovery-related sanctions are generally permissible to protect the integrity of the judicial process, a sanction of dismissal is reserved for violations "predicated upon willfulness, bad faith, or some fault of [the party] rather than inability to comply." *Archibeque v. Atchison, Topeka & Santa Fe Ry. Co*., 70 F.3d 1172, 1174 (10th Cir.1995); s*ee also Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir.2005).  Because dismissal is such a harsh sanction, it is appropriate only in cases of willfulness, bad faith, or some fault).

## II.    Fourth Motion for Sanctions (Doc. 306)

The Fourth Motion for Sanctions addresses five categories of material: (1) April 24 & 25, 2012 Supplemental Production; (2) Nurse case manager files produced April 30, 2012; (3) Claim Review (or auditing) documents; (4) MDM screens and nurse "time tracking"; and (5) Supplementary Claim Financial Information.  In considering Defendant's conduct relative to the Fourth and Fifth Motions for Sanctions, the Court makes a distinction between the conduct of former Jackson Walker counsel (Robert L. Sosa, Jr. and Pamela M. Bell) addressed in Plaintiff's previous motions for sanctions, and the conduct of Liberty and current counsel in the Fourth and Fifth Motions for Sanctions.  In other words, the Court is mindful of the nature of Liberty's previous conduct but at the same time, views Liberty's conduct on a "clean slate" for purposes of addressing the Fourth and Fifth Motions for Sanctions.  Doing otherwise would not allow Liberty a chance to rectify past abuses by making disclosures on material that is newly discovered without fearing that such disclosures would be viewed as having withheld the material in the first place.  Of course, the Court keeps in mind Defendant's diligence in uncovering such newly discovered material.

A.      April 24 & 25th Supplemental Production

This category of material refers to 763 pages of documents produced shortly before a scheduled deposition.  Atlas contends that the documents were produced without referencing the particular requests for production ("RFP") to which the documents were responsive.  Liberty contends that it explained to Atlas that the documents were discovered during a quality control review, and that it did identify the material as responsive to RFP 8, 9, 11, 12, 13, 14, 15 and 16.  These documents came to light as part of Liberty's self-initiated review following the Court's Orders on Plaintiff's Second and Third Motions for Sanctions.  In looking back over electronically stored files of two of Liberty's records custodians, Susan Doyle and Terri

McGuire, Defendant became aware of the existence of separate paper files kept by these two individuals.  Mr. Moran, then on the case for five months, instructed that a search be conducted for these paper files.   When they were found, Liberty disclosed them to Plaintiff.  This material includes the location and production of seven additional emails concerning collateral reports and draws on letters of credit by Liberty (including non-Atlas accounts).

Under an *Ehrenhaus* analysis, the Court finds the delay in disclosure to be sanctionable. This litigation of this case involves the production, organization and use of literally thousands of documents.  Disclosure of this category of material certainly should have been disclosed earlier. However, the Court does not find this conduct to meet the *Ehrenhaus* factors of prejudice, interference, or culpability sufficiently to warrant the degree of relief requested by Plaintiff. Atlas never sought to depose either Ms. Doyle or Ms. McGuire, and actually did get to use this material during the deposition of another Liberty witness.  Also, this supplementation was made voluntarily by Liberty, as part of its own internal efforts to comply with the Court's previous Orders.

B.      Nurse Case Manager Files

These files were produced April 30, 2012, and concern the training and oversight of nurse case managers.  These files were produced shortly before Atlas served notice of a Rule 30(b)(6) deposition, and some of this information was responsive to previous RFP and had already been produced.   Atlas contends that the manner in which this material was presented is sanctionable, and the Court agrees.   Liberty was required to produce these documents in a way where Atlas would know which of these thousands of pages of documents had already been produced and to what RFP they were responsive.  However, the Court notes that Atlas did use the documents produced for the 30(b)(6) deposition.  Also, there may be some question about how responsive

these documents actually were to prior RFP's for policies about the "use of nurses" in handling claim files.  Liberty has offered Atlas the opportunity for further deposition if necessary.

C.     Claim Review Documents

These documents consist of six "QA" reviews of nurse case managers who worked as claims adjusters on Atlas' claims.   Two of the six reports purportedly gave perfect performance scores, and some had minor critiques.  Atlas claims that this material was responsive to previous requests for production (RFP 1 & 2).   Certainly, this material should have been produced earlier, but it appears that this material is somewhat peripheral to Plaintiff's claims, as these claim reviews are more like report cards of the nurse case managers rather than an evaluation of the results of Atlas' claim.   The material was found after a 30(b)(6) nurse manager deposition, at which point Liberty searched for and produced these reports.

Other documents belong in this category as well: nine claim reviews previously tagged as privileged by former Jackson Walker attorney Pamela Bell.   The non-production of these documents was discovered in July 2012 by current Jackson Walker counsel, and the documents were then produced.   However, none of these 9 reviews concern the 181 claims requested by Atlas nor any of the 60 files on which Atlas' expert relies.   Additional claims reviews were found in July 2012, again, as part of Liberty's re-investigation of Plaintiff's past discovery requests.  Some of these reports had not initially been disclosed because they were generated as reports by local claims managers and not from the commercial workers' compensation examining group from which Liberty had obtained its discovery information.  Pratt Dec. ¶ 5, Doc. 315-2.

It is clear that these documents should have been produced in response to previous RFP's and before the 30(b)(6) deposition (rather than after).  It is also clear that these documents would

have been discovered following a reasonably diligent search by competent counsel.  The

designation of some of the documents in this category as "privileged" was made by a former

Jackson Walker attorney, but they were ultimately unearthed and disclosed as a result of the

efforts of Liberty's current counsel.   While there is obviously some prejudice to Plaintiff

because of the delay in production, there is also some indication that Atlas' expert has conducted

his own review of the relevant claims files.  Also, Defendant offered to reopen at its own

expense the 30(b)(6) depositions that were affected by the delayed disclosure of these

documents, but Plaintiff declined the offer until the Court ruled on the motions for sanctions.

D.      MDM Screens and Nurse "Time Tracking"

        The existence of records regarding the claims posted in the medical and disability

management screens ("MDM") of the Liberty computer records came to light only after the

30(b)(6) deposition of a Liberty witness.  Defendant blames this oversight on the vagaries of its

electronic storage system, contending that it was unaware that some of the information obtained

from the MDM screens are different from those posted on another system (the "Watson" system)

which supposedly included information contained the MDM screens.   Similarly, nurse case

manager "time tracking" records were not produced.  These are records of nurse case manager

activities kept like journal entries for each claim (date of services, charges for nurse's time, and

subcategories of type of activity, travel and wait time).  Here again, Liberty blames the problem

on its electronic storage system, explaining that Atlas was already given these records in a

Medical Cost Summary ("MCS") report which contains information about the claim but does not

include very detailed information such as wait time.

        In an effort to produce all of the information Atlas requested, Liberty finally created a

separate report that could be searched and sorted.  While this report is largely cumulative of

produced MCS reports and nurse case manager journal entries, at least it contains all of the information Atlas requested.   The fact that Liberty ultimately produced the information does not change the fact that the disclosure of this information was delayed.   However, it is not clear how much Atlas was prejudiced by the delay, since according to Defendant, the total for the aggregate claims was not affected.   The Court's view is that Liberty is a big player in the insurance industry and surely a sophisticated player in the litigation field.   Delayed disclosures based on overlaps and omissions in software programs are poor and unacceptable excuses for non-compliance with discovery obligations mandated by the Federal Rules of Civil Procedure and controlling case precedent.

E.    Supplementary Claim Financial Information

Yet another software "glitch" was blamed as the culprit for non-disclosure and delayed disclosure of claim information regarding almost $120,000 in payments made on Atlas' claims. Liberty claims it overlooked this information because the different reports generated by the different software ("BoComp Clump" reports; MCS reports; Watson Notes "Service Lists"; and Watson Notes "Financial Transactions" summaries).   Each software collects slightly different information on codes pertaining to the financial transactions on the claims files at issue.   In the aggregate, all the information is there, but no one report has it all.   Thus, disclosures Liberty had made were incomplete.

On May 31, 2012, Liberty advised Atlas that it had located these documents, and filed a Notice of Supplemental Production of Claim File Information with the Court, explaining all the reasons for incomplete information regarding all indemnity, medical and expense financial transactions.   Doc. 305.   These reasons have some connection to five specific codes which were not picked up and stored by the software Liberty was using at the time to collect and store

15

financial transaction data from a number of payment systems ("Loss Data Warehouse").   Liberty

supplemented the production of documents by generating a new report utilizing a different

software tool called Information Warehouse Environment ("IWE") which gleans financial

transaction information from multiple claims processing systems (such as BoComp payment

system, Managed Payments System and the Loss Data Warehouse) and collects this information

into one report.  The IWE report does not exist in the ordinary course of Liberty's business, but

Liberty has used it to provide Atlas with information about all the individual financial

transactions on the claims files that were the subject of Atlas's request.   Liberty also created a

searchable, sortable Excel file listing all transactions, including those associated with the five

transaction codes that had not been picked up earlier.

       While this lately-discovered omission has interfered with the expeditious handling of this

case, the prejudice to Plaintiff appears to be marginal.  Notwithstanding the missing individual

payment information associated with the five transaction codes at issue, the financial transaction

totals disclosed in the materials provided to Atlas were still correct.   Also, the Court does not

find current Liberty counsel to be culpable under the *Ehrenhaus* standard necessary for

completely dispositive sanctions.  The information gaps were the result of programming errors

made in the 1980's, and the supplementation was done voluntarily by Liberty's current counsel.

When Liberty learned of the omissions, counsel made efforts to fully comply with its discovery

obligations, including offering to have Atlas take additional depositions where necessary at

Liberty's cost.   Atlas declined and proceeded to file the Fourth Motion for Sanctions.

## III.      Fifth Motions for Sanctions (Doc. 321)

       While the Fourth Motion for Sanctions was still in the briefing stage, other issues

involving undisclosed discovery material came to light.  These became the subject of the Fifth

Motion for Sanctions, and one category of these documents is referred to by Plaintiff as the "smoking gun" of discovery materials.

A.      October 29, 2009 e-mail ("Tipton emails")

The production of materials relating to revised collateral calculations were requested by Atlas as far back as January 2010, as well as in early requests for production.  No responsive documents along this line were ever produced.

At the hearing before the undersigned held on November 30, 2009 in relation to Plaintiff's request for preliminary injunction, Mr. Tipton testified under oath that he did not have the revised calculations for the collateral amounts owed by Atlas until after November 4, 2009, when Liberty drew down on Atlas' LOC.   Mr. Tipton was asked why he did not provide Mr. Daskalos with the revised calculations for the month of December:

Q.      . . . You had indicated, though, that you're going to have these revised letter of credit numbers on Monday [November 2, 2009].  Why didn't you provide Mr. Daskalos with the revised letter of credit number?

Mr. Tipton answered:

A.      Because our actuary was not available until later that week, and it takes a little while to work up the security calculation.

Doc. 284 at 98:7-9.

When asked why he waited until after November 4th to provide the revised letter of credit amount, Mr. Tipton answered:

A.      Because I didn't get it from the actuary until then.

Doc. 284 at 101:15-17.

In light of recent disclosures, it appears that Mr. Tipton's statements are at best misleading, and at worst—constitute perjury.   On June 15, 2012, Atlas sent Liberty an 11th RFP asking for letters or emails relating to the calculation of the collateral requested from Atlas to secure the workers' comp claim expense payments after termination of Atlas's policy effective December 1, 2009.  This RFP was propounded in preparation for Atlas' June 21, 2012 deposition of Jeffrey Cole, the actuary who worked under Tipton and who was involved in working up the collateral calculations owed by Atlas owed for December 2009.   After about two years from the date this material was first formally requested by Atlas, and on the same day this 11th RFP was propounded, Liberty was able to uncover a string of emails with attachments dated October 29, 2009 between Tipton and Cole, dealing with the revised collateral calculations (hereinafter, "Tipton emails").  On June 18, three days before Cole's deposition, Liberty's counsel sent Atlas the emails.

The Court agrees that this is, without a doubt, the most egregious omission by Liberty. This information goes to the very heart of the case.  Plaintiff's theory is that Liberty deliberately withheld information of the revised collateral amounts until November 5, 2009 in order to have a reason to seize the funding in the LOC; in other words, Liberty was setting Atlas up to default on the LOC.   Now, with the disclosure of the Tipton emails, it seems clear that Mr. Tipton had the information prior to November 4, and misrepresented or outright lied to Mr. Daskalos during the course of negotiations and to the Court when Mr. Tipton testified at the November 30, 2009 hearing.

At the March 13, 2013 sanctions hearing before the undersigned, Mr. Moran strenuously objected to the characterization of the Tipton emails as a "smoking gun" and of Tipton's testimony as a lie, venturing the explanation that the calculations Mr. Cole sent to Mr. Tipton

were not "final" because they were not updated to include payments made on claims by Liberty from July through October.   Mr. Moran also pointed out that Liberty offered to have Mr. Tipton re-deposed at Liberty's expense, but Atlas declined.  Perhaps re-deposing Mr. Tipton would have cleared up some questions, but the Court also notes that Liberty has never offered anything by way of an affidavit or declaration by Mr. Tipton to attenuate the "smoking gun" appearance of the emails.

There are serious considerations here regarding the *Ehrenhaus* factors, mainly on the prejudice to Atlas, which cannot be overlooked because of the nature of this material.  The lack of information given to Atlas prior to November 4, 2009 can easily be considered the trigger for this lawsuit, and it would not be rash to suggest that this case might have settled had these materials been disclosed when the case was in its early stages of litigation.  Moreover, had the content of these emails been the subject of direct and cross examination of Mr. Tipton at the November 30, 2009 preliminary injunction hearing, the Court may have found Atlas' Motion for Preliminary Injunction to be meritorious.

At his deposition, Mr. Cole did not deny sending Tipton the emails, but testified he could not explain their content and had no memory or preparing the chart attached to one of the emails. Doc. 339, Ex. 2 (Cole Depo. at 78:19; 79:21; 73:2-3; 75:16; 76:3).   Liberty argues that Mr. Cole's lack of recall goes against a finding of prejudice, but the Court finds that the better argument is that, had Liberty disclosed this material when first requested, Mr. Cole likely would have had better memory recall.

1.      *Prejudice and Interference*

The prejudice to Atlas is attenuated, but only slightly, by the fact that the Tipton emails were produced before the Cole deposition took place so that Plaintiff had the benefit of these

materials in questioning Mr. Cole.  Also, Liberty offered to pay for the expense of having Mr.

Tipton re-deposed, but Plaintiff rejected the offer.   It is entirely possible that, while Mr. Cole

had no recollection of the substance of the emails, Mr. Tipton (having promised Mr. Daskalos

this information) would have a better memory of whether he had this information before

November 4, 2009.[5]

     2.   *Culpability*

In terms of the Tipton emails not being timely disclosed, Liberty was not responsible for

this particular discovery abuse because Liberty turned over these emails to Liberty's counsel,

Jackson Walker, upon Atlas' request.   Attorney Moran accepts full responsibility for the non-

disclosure and the fault for this particular discovery abuse, like many of the other discovery

abuses in this case, lie squarely with the former Jackson Walker lawyers representing Liberty

before Mr. Moran's involvement in the case.

Mr. Moran explained (both in the underlying briefs and at the hearing), that in receiving

the 11th RFP from Atlas, he discussed with and asked his partner, Chris Thompson, to

immediately search for any responsive documents.   Mr. Thompson located the emails that same

day.  Mr. Moran determined that the emails were responsive to the 11th RFP, that they were not

privileged and would be pertinent to the upcoming Cole deposition.  Accordingly, the emails

were promptly disclosed to counsel for Atlas.   Doc. 335-1.

In determining the level of culpability on the part of Liberty's current counsel, the Court

accepts the representations of Mr. Moran that he was unaware of the existence of the Tipton

emails until he conducted a search in response to the 11th RFP.   According to Defendant, the

emails had been marked as privileged and in anticipation of litigation by an associate when they

---

[5]   The Court makes no finding at this time whether Mr. Tipton lied under oath at the November 30, 2009 hearing.
However, the Court will keep this issue under advisement for future consideration of sanctions against Mr. Tipton
which could include contempt of Court for perjuring himself.

were first identified by Liberty in response to a RFP. There is certainly evidence that Atlas had

threatened Liberty with legal action in October 2009, but that does not explain why these

documents were not listed on a privilege log when first marked as privileged. As early as May

2010, Liberty was told by formal order that the failure to produce a privilege log waives the

privilege. *See* Doc. 63 (Mem. Opin. & Order by Magistrate Judge Puglisi). Further, if the

documents were not intentionally withheld from production, why were they not discovered for so

long?

Current Liberty counsel admits that the documents were not reviewed for a final privilege

determination, and that they should have been. Liberty has taken full responsibility for the error

and has, admittedly, attempted to rectify it as much as it can at this point (see discussion on

materials subsequently disclosed as a result of uncovering the Tipton emails, below). Mr.

Moran ensured that the materials were promptly disclosed to Atlas prior to Mr. Cole's

deposition, even though they were not required to do so until several weeks later. Current

counsel seems to be engaged in a kind of continual "catch-up" to rectify the discovery abuses

and games visited upon Atlas by Liberty's former counsel. On the other hand, while counsel's

intentions were noble, had counsel made it a priority to conduct a review of these "privileged"

materials earlier, this case might well have been resolved by now. In fact, had the discovery

abuses in this case not occurred, the case would have been tried or settled in the latter part of

2011 or 2012, and that time line is taking into account the Court's criminal caseload.

Consequently, there is some level of prejudice to Atlas in terms of not having a timely resolution

of this case.

For this reason, I find that defense counsel's conduct meets the criteria of *Ehrenhaus* sufficiently to warrant severe and dispositive sanctions, although not to the degree requested by Plaintiff.

B.      Additional Production of Documents Subsequent to Tipton Emails

Following the recovery of the Tipton emails, defense counsel conduct a further search of all internal communications that had previously been marked as "privileged" to ensure that other responsive material that was responsive to Atlas' RFP.  The search was overseen by Julia Mann, a Jackson Walker attorney.   Ms. Mann determined that 30 other documents had been marked as privileged in the review, but were neither logged nor produced.  As a result of the review, 22 of these documents were produced to Atlas.  Doc. 335-2.

In all, 39 other documents were produced subsequent to the Tipton emails, some on July 11, 2012, and the remainder on July 27, 2012.   These documents had been coded as "privileged" (like the Tipton emails) but had not been logged or produced to Atlas.  Some of these documents were other emails generated by Liberty officials, many of which indicate Liberty's huge concern about the financial health of the bank which held the initial LOC.   Also included in these 39 documents are several hundred pages of claim file audit reports, which should have been produced in response to Atlas' previous requests for production.  There is no evidence that current counsel knew about these documents prior to June and July of 2012.

While Atlas may be prejudiced by not having this information disclosed to them previously, it seems that the degree of prejudice may not be great, as much of this information appears to be cumulative to other documents already produced.  However, the Court finds this to be no excuse for defense counsel's failure to locate this material when it was first requested.  Current counsel for Liberty has, as the Court has previously mentioned, taken efforts to comply

with the Court's Orders on Plaintiff's second and third motions for sanctions.   Jackson Walker's internal database appears to have been a treasure trove of documents, some of which should never have been marked "privileged"; or if they were marked "privileged," they clearly should have been logged.  A final review of this database for all material marked "privileged" should have been a top priority for Liberty's counsel, especially considering that the privilege issue was so  hotly contested by Liberty—and rejected by Magistrate Judge Puglisi—very early on in the case. *See* Doc. 64 at 2.

## CONCLUSION

The Court has expended considerable time reviewing and considering the parties' oral and written arguments.  The Court was initially leaning toward granting the extreme dispositive sanctions ("the death penalty" sanctions) requested by Plaintiff, but on closer inspection of the nature of the discovery abuses in the instant two motions, the Court concludes that the culpability factor does not warrant such a severe sanction although clearly sanctions are justified.

## I.    Basis for Sanctions

In many ways, Defendant's discovery abuses raised in Plaintiff's first, second and third motions for sanctions continued after the Court's Orders on these motions.  Material which should have been disclosed earlier was not produced until shortly before 30(b)(6) depositions. Documents were not produced either because of software issues (on Liberty's part) and/or because they were incorrectly marked as "privileged" and never logged or reviewed (on counsel's part).   The delay in Defendant's production of these materials has had an impact on the Court in terms of judicial economy, as well in the increased cost to Atlas in gathering and organizing this enormous volume of material to litigate this case.   It is difficult enough to prepare for litigation in a case that is so document-intensive when the requested discovery

material is produced in a timely fashion; but unnecessary delays wreak havoc where a party has

to repeatedly fight to get the information it seeks and to which it is entitled.

A.    Prejudice to Plaintiff

    The Court has already discussed the prejudice to Plaintiff which was the result of

Defendant's delayed production of various discovery materials.  Clearly, the most unsettling

delay concerns the Tipton emails.  The production of this material at an earlier stage of the

litigation may well have put this case in a much different posture by this time, and in the very

least, would have affected how Plaintiff conducted discovery thus far.   While the Court does not

necessarily fault Plaintiff for refusing Liberty's offer to re-depose certain key witnesses, it is to

some extent speculative to assume that the prejudice is incurable by re-deposing these witnesses.

Plaintiff makes a good point that memories fade with time, but the measure of that loss is hard to

calculate.  For example, because Plaintiff did not accept Liberty's offer to re-depose Mr. Tipton,

there is no way to know whether Mr. Tipton also would have experienced the same lack of

recollection as Mr. Cole.

B.    Interference With Judicial Process

    This case was filed in state court and removed to federal court in November 2009.  Three

and one-half years later, this case is just finishing its discovery phase (although there will be

more depositions), not because of the complexity of the case, but because historically, Plaintiff

has been forced to wrench discovery production from Liberty and its counsel.  The Civil Justice

Reform Act (CJRA), 28 U.S.C. § 471 et seq. has two goals: (1) to expedite the ultimate

disposition of litigation; and (2) to reduce the costs of litigation.  The conduct of Liberty and its

former counsel has clearly and substantially thwarted both of these objectives.

The remaining question for the Court is to what degree have the discovery abuses in the Fourth and Fifth Motions for Sanctions interfered with the judicial process? In this case, it is not possible to consider the interference factor without also understanding the reason for the delay of discovery production because of the change in counsel for Liberty. Jackson Walker seems to have treated the Court's Order on Plaintiff's Second and Third Motions for Sanctions as a watershed mark. Former counsel—both of them—are no longer associated with the case. It is obvious to the Court that much of Defendant's conduct discussed in the Fourth and Fifth Motions for Sanctions was a result of Liberty's current counsel struggling to correct past discovery abuses and to "catch up" with its discovery obligations which were treated so cavalierly by former counsel. In an effort to correct past abusive and sloppy discovery practices and to comply with the Court's Orders, Mr. Moran embarked on a process that included: interviewing all key records custodians; reviewing all of Atlas' previous requests for production; and reviewing the firm's procedures to ensure all responsive documents were produced. Much of the delayed discovery material was produced voluntarily by Defendant, for example, the documents found and produced to Atlas subsequent to the Tipton emails.

C.    Culpability

Under the *Ehrenhaus* factors, default judgment to Plaintiff is a sanction that is reserved for violations "predicated upon willfulness, bad faith, or some fault of [the party] rather than inability to comply." *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1044 (10th Cir.2005); *Fed. Deposit Ins. Co. v. Daily*, 973 F.2d 1525, 1530 (10th Cir.1992).

After careful consideration, the Court finds that the discovery conduct at issue in Plaintiff's Fourth and Fifth Motions for Sanctions does not warrant the full-scale sanctions requested by Plaintiff because in all of the circumstances, current counsel for Liberty was not

aware of the documents and material which was finally produced to Plaintiff, even though they should have been produced much earlier, when former Jackson Walker counsel was involved in the case.  *See, e.g., Salas v. Brigham,* No. Civ. 08-1184, 2010 WL 4322622 at *4 (D.N.M. Oct. 6, 2010) (denying motion for default judgment where defendant was unaware of existence of documents).  The Court is aware that Liberty's counsel (including current counsel) has made previous representations that all discovery requested by Atlas and to which Atlas is entitled, was produced.   However, the Court is convinced that current counsel's representation was made in good faith, and that the failure to produce all discovery materials that should have been produced earlier was a result of oversight and disorganization, combined with the sheer volume of documents involved in the requests.  *See Salas,* 2010 WL 4322622 at *6  (holding that late production was not evidence of willfulness or bad faith where defendants produced phone records after stating that all such records had been produced).

As support for its position, Plaintiff looks to another case which involved Liberty and where the district court precluded Liberty from asserting a defense of no duty to defend as an appropriate sanction for abusive discovery practices:

> Liberty Mutual's approach to discovery process as a whole involves delay, obstruction, obfuscation and disingenuity . . . . If the name of the game is 'hard ball litigation,' Liberty Mutual qualifies as a major league team.

164 F.R.D. at 509.

*Adolph Coors Co.  v. Amer. Ins. Co. & Liberty Mutual Ins. Co., et al.,* 164 F.R.D. 507, 509 (D.Colo. 1993).   The Court agrees with Plaintiff that the conduct described in Coors is similar to the type of conduct going on here, particularly when describing the conduct which occurred under the representation of former Jackson Walker counsel.

Liberty maintains that any delayed production was the result of inadvertence and simple neglect, and not willful disobedience of the Court's orders. Liberty also argues that the belated production of some documents does not show willfulness or bad faith. The Court cannot find a "willful disobedience" or an intentional failure to comply in the discovery conduct of either Liberty or Liberty's counsel which is the subject of the Fourth and Fifth Motions for Sanctions. The Court accepts counsel's proffers of Liberty's efforts to comply with the Court's Orders and the New Mexico Rules of Professional Conduct, which are incorporated into this Court's local rules. *See* D.N.M.LR-Civ. 83.9.

At the same time, however, Liberty is not completely innocent. A lawsuit against an insurance company can easily encompass hundreds and even thousands of documents. While electronic storage can admittedly be both a boon and a curse, one would expect Liberty to have enough control over the organization and storage of the massive amounts of information it collects so as to avoid the kind of omissions and oversights which occurred here. As for the Tipton emails, Jackson Walker's internal database probably should have been one of the first places Mr. Moran looked in ensuring that all of Plaintiff's previous requests for production were answered. Liberty is a sophisticated player in the litigation arena, and the software glitches and discovery bungling that occurred here are inexcusable.

For the foregoing reasons, the Court finds that sanctions are warranted to address the prejudice, interference and culpability factors of *Ehrenhaus*. However, under *Ehrenhaus,* the Court finds that sanctions less than default judgment to Plaintiff are appropriate. *See, e.g., Encon Intern., Inc. v. Garrahan,* unpubl. opin., 2012 WL 4210493 (D.Kan. 2012) (dismissal of counterclaim as sanction for defense witness's failure to appear for a deposition).

D.     Lesser Sanctions

A considerable amount of material was been produced of late on Liberty's initiative rather than at Atlas' request.   The Court also notes that at all points where Liberty disclosed materials late, Liberty offered Atlas to have additional depositions taken at Liberty's expense. Defendant's directive was clear after the Court ruled on the Second and Third Motions for Sanctions, and many of the oversights, particularly the discovery of the Tipton emails, could have been avoided with some care and diligence on the part of Liberty's counsel.   Nevertheless, while this conduct appears to be more than involuntary noncompliance, it does not quite seem to be an intentional failure.

Without a showing of actual fault or bad faith, the Court will not impose the dreaded "death penalty" sanction of default judgment for Plaintiff.   However, severe sanctions are nevertheless appropriate, based on the Court's finding that Defendant's conduct is less than willfulness or bad faith, but more than simple negligence or inability to comply.

## II.      Sanctions Imposed by Court on Liberty and Liberty's Counsel

Plaintiff requests the following relief: (1) dismissal with prejudice of Liberty's counterclaims and affirmative defenses; (2) Judgment against Liberty on liability and a return of fixed amounts that were taken ($6,783,268 from the LOC plus $440,368 from a bank account); and (3) allow Plaintiff to proceed to trial on remaining compensatory damages and punitive/treble damages, allowing the jury to hear evidence on Defendant's discovery abuses committed during the litigation as evidence of bad faith.

There is also the question of whether Liberty and/or counsel for Liberty was responsible for the discovery abuses, and should be sanctioned.   *See Tom v. S.B., Inc.*, 280 F.R.D. 603, 612 (D.N.M. Feb. 10, 2012) ("In reviewing whether sanctions are appropriate, the court should consider who acted in bad faith, the party or the attorney, and to what degree.").   "[I]f the fault

lies with the attorney, that is where the impact of the sanction should be lodged." *Id.* (citing

*M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 873 (10th Cir. 1987).   When asked whether

Plaintiff was seeking sanctions against Liberty or Liberty's counsel, Plaintiff's counsel stated

that she was leaving the Court to decide that issue.  The Court is not quite sure how to resolve

this issue, since it is not privy to any information regarding these discovery abuses that Plaintiff

is not already aware of.   While Liberty had turned over the Tipton emails to counsel and is not

responsible for the nondisclosure of these particular documents, Liberty is well-situated to ensure

that software anomalies do not get in the way of discovery production.  After all, Liberty as a

major insurance carrier in the United States is no stranger to litigation.  Thus, the Court makes no

explicit determination on this issue  except to say that there is enough culpability to go around

for both Liberty and its counsel.   As noted earlier, Magistrate Judge Molzen had noted that it

was "impossible to tell" whether Liberty itself engaged in duplicitous conduct or whether

counsel just relied on Liberty to produce what was requested.  Doc. 239, ¶ 46.

The Court finds that the following sanctions are appropriate under Rule 37 and

*Ehrenhaus,* and shall be imposed on Defendant Liberty and/or its counsel:

- Defendant's non-equitable counterclaims shall be STRICKEN, and its defenses shall remain intact;

- Defendant shall pay the reasonable fees and costs associated with the filing of the Fourth and Fifth Motions for Sanctions.  It is strongly suggested that parties settle on an amount that represents a reasonable amount of fees and costs.   If parties cannot agree on an amount within forty-five (45) days of the entry of this Order, the Plaintiff shall file supporting affidavits and documents for fees and costs within twenty (20) days after the 45-day deadline for agreeing on an amount, and Defendant shall respond within ten (10) days of the filing of the affidavits and documents.  Resolution of disputes regarding reasonable fees and costs associated with the filing of the Fourth and Fifth Motions for Sanctions, if necessary, is referred to Magistrate Judge Karen Molzen;

- For all re-depositions for which Liberty or Jackson Walker has offered to assume the expense, Liberty or Jackson Walker shall pay for the reasonable fees and costs incurrent in attending these depositions;[6]

- While certain experts may need to amend their reports, Liberty should not bear the entire cost of an amended report, because these experts would have addressed the supplemental reports had they been produced earlier and Atlas would have borne that cost.   However, Liberty shall be responsible only for the cost that the expert has charged, if any, only for rewriting any portion of the original expert report because he or she did not have the supplemental information earlier.  *Cmp. Salas v. Brigham,* No. CIV 08-1184, 2010 WL 4322622, at *4.   If parties cannot agree on the financial obligations on this issue, parties shall take the matter up formally with Magistrate Judge Molzen;

The Court strongly urges parties, given the already formidable amount of time the Court has expended on these matters, to resolve these issues as expediently as possible, and with minimal Court intervention.

Following the entry of this Memorandum Opinion and Order, the Court intends to order mediation before a private mediator, with Liberty bearing the fees and expenses.  The Order of mediation will be entered separately.

Finally, the Court orders the publication of Magistrate Judge Molzen's Report and Recommendations, filed September 8, 2011 (Doc. 239).

Also, because the Court has not found bad faith on the part of Defendant under the *Ehrenhaus* standard, the jury will not be allowed to hear evidence on Defendant's discovery abuses committed during the litigation as evidence of bad faith.  Any sanctions requested by the Plaintiff which are not included here are considered as denied by the Court.

With the imposition of these sanctions, it is the Court's intention to move this case back on course for litigation or settlement, as the Court has always viewed this case in its distilled form purely as a business dispute.

**THEREFORE,**

---

[6]  The Court takes no position on the manner in which Liberty and Jackson Walker bear the sanction expenses in this case.

**IT IS ORDERED** that Plaintiff's Fourth Motion for Sanctions (**Doc. 306**); and Plaintiff's Fifth Motion for Sanctions (**Doc. 321**) are hereby GRANTED IN PART and DENIED IN PART, as described in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE